548 So.2d 389 (1989)
Alfred Dale LEATHERWOOD
v.
STATE of Mississippi.
No. DP-70.
Supreme Court of Mississippi.
July 19, 1989.
*390 John H. Anderson, Hattiesburg, Clive A. Stafford Smith, Atlanta, Ga., for appellant.
Mike Moore, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., and Donald G. Barlow and Felicia C. Adams, Sp. Asst. Attys. Gen., Jackson, for appellee.
EN BANC.
ANDERSON, Justice, for the Court:
Alfred Dale Leatherwood has appealed his conviction in the Circuit Court of Forrest County of rape and sentence to death. Because of the improper admission of hearsay testimony of statements made by the victim, we reverse and remand. We also find that under our present statute the maximum penalty if convicted upon re-trial is life imprisonment.

FACTS
In March, 1985, the eleven-year-old victim, a fourth grade student at the Grace Christian elementary school in Hattiesburg, lived alone with her mother Mrs. V. Older siblings of the victim's lived elsewhere.
Just down the street lived Mrs. G.B., Mrs. V's sister. Mrs. G.B. and her husband had several children, some of whom lived in their household. Also living in the same neighborhood was Mrs. C.B., the aunt of Mrs. G.B. and Mrs. V. The victim called Mrs. C.B. "Big Mama." Mrs. C.B.'s three daughters lived with her, as well as two grandchildren.
A close relationship existed between the sisters and their aunt. The victim and her mother were in Mrs. G.B.'s and Mrs. C.B.'s houses every day. Mrs. V. would take the victim to get the bus near the G.B. residence, and the victim would return there after school. She worked on her lessons at Mrs. C.B.'s home. It was customary for Mrs. V. and the victim to watch television in the G.B. home each evening after supper.
There was a special place Mrs. G.B. put her house key when she was away, and the victim knew its location. If no one was at home when the victim went to Mrs. B.'s house, she let herself in.
Because she failed the victim had to take the first year over. She was in the special education class in school, and also had a "speech pathologist" to help her with her speech.
Mrs. Patsy Smith taught the victim's fourth grade class. After lunch the children could either read or sleep at their desks. During this period on April 30, 1985, the victim went to sleep, and woke up crying. Mrs. Smith saw her staring into space and distressed, thought she was disoriented, and tried without success to comfort and reassure her. She then took her to Mrs. Downey, the special education teacher. Mrs. Smith returned to her classroom and did not see the victim again that day.
On the next day, May 1, the victim essentially repeated her behavior. Mrs. Smith could not take her to Mrs. Downey at the time because she was not in her classroom. She decided to take the victim to the principal's office, a Mr. Blackwell. The principal had an excellent relation with the children at school. En route to his office, they met Mr. Blackwell and Mrs. Downey walking in the hall.
*391 The victim was visibly frightened at Mr. Blackwell, cringed, and buried herself into Mrs. Smith's lap. Noticing this, he left. Mrs. Smith again reported to Mrs. Downey that the victim was upset. They took her into the library and Mrs. Smith left.
Mrs. Downey taught the victim five days a week. She recalled Mrs. Smith bringing the victim to her on April 30. The victim was sobbing and appeared disoriented. She could not speak, and Mrs. Downey suggested to the victim that she attempt to write what was on her mind. The victim's note was introduced at trial as Exhibit 2 for identification. It mentions rape.
The next day she noticed the victim was more agitated when Mrs. Smith brought her, bordering upon being hysterical.
Mrs. Downey tried to comfort the victim, but was unable to get her to talk. The victim finally asked to see one of her classmates, and when the child came the victim talked in torrents. She related that a boy had come to Mrs. G.B.'s home and raped her.
The school sent for some member of the victim's family to come for her.
Mrs. Downey told the victim's sister that the victim needed to be seen by a doctor, that she had been raped.
On the way to Mrs. G.B.'s house, the victim was shaking and sobbing. She finally told several members of her family that she had been raped.
Mrs. G.B. described the victim's condition when she got to her house:
Q. What kind of condition was the victim in?
A. Well, she was real hysterical. Shaking and we couldn't hardly control her and she would lay down like she was falling out or something, sleeping a while and she'd wake up and holler and scream and shake and holler "get away from me" and all that kind of stuff. We couldn't hardly control her.
(R. 393)
Finally, after calming down, the victim told Mrs. G.B. that "Alfred" had raped her in Mrs. G.B.'s house. Alfred was the defendant  Alfred Dale Leatherwood. He was 22 years of age at the time, the nephew of Mrs. G.B.'s husband, and a frequent visitor in the G.B. home.
Mrs. G.B. and Mrs. V. were up most of the night with the victim. She would wake, scream and yell "get away from me." She appeared hysterical.
The next day Mrs. G.B. attempted to check the victim physically, but the victim would not allow it. This continued on into the afternoon, and the victim was eventually taken to Mrs. C.B.'s house. Mrs. C.B. was able to persuade the victim to let her examine her, and she described her vagina as opening to the "size of a quarter," was raw and irritated. The victim was frightened and hysterical. She also showed her aunts and mother the Playboy magazine Alfred had produced and displayed in the G.B. home the day he raped her.
On May 2 she was taken to the Forrest General Hospital and seen by William E. Walker, M.D., the emergency room physician. The victim would not permit him to make a pelvic examination. She did tell Dr. Walker that she had been at home, that a friend of her aunt's had come into the house and asked to borrow some salt, and then grabbed her and put a gag around her mouth and raped her.
The victim was taken the next day to Hilda Jane Edwards Magee, M.D., a gynecologist and obstetrician. She was frightened and upset, and would not allow a thorough pelvic examination. Dr. Magee was able to observe, however, that her vaginal opening was stretched more than what would be expected in an eleven-year-old female who was not active sexually. Ordinarily the hymen is closed. She was of the opinion the victim had been sexually active. The victim did not permit Dr. Magee to insert a cotton swab for a smear.
H. Lamar Gillespie, M.D., also a gynecologist and obstetrician, saw the victim on May 16. She came to him having abdominal pain. He, too, was unable to complete an examination of the victim because she was upset and crying. Dr. Gillespie said the vaginal opening in an eleven-year-old *392 child was variable. An enlarged opening could be the way she was born, caused by sexual intercourse, or an object inserted in the vagina.
Mrs. Valmena Smith Blackmon, a speech pathologist in the victim's school, had the victim in her class. On May 20 she noticed that the victim appeared dazed, and began to cry. Mrs. Smith asked her if she wanted her to get Mrs. Downey, but the victim did not. Instead, the victim began writing, and Mrs. Smith did not disturb her. When she had finished she handed it to Mrs. Smith. The note implicated Leatherwood having threatened her, that she was ashamed that no one believed her, and that she was leaving.
Linda Moore, a children's service specialist with the Pine Belt Mental Health and Retardation Services in Hattiesburg, saw the victim at the end of May, and had nineteen sessions with her, running through June. When she first saw the victim, she was running through the halls, crying. The victim asked Moore why she was laughing at her. She told Moore that she was a man dressed like a woman. The victim would stare into space, and Moore thought she had a reactive psychosis precipitated by stress. At the end of the sessions she had improved.

LEATHERWOOD
At 8:00 a.m. on May 3 Robert Neal (Bob) Hopkins, a detective with the Hattiesburg police department, questioned Leatherwood in his office. Only the two were present. Hopkins read the Miranda warning to Leatherwood, who admitted that he had pinched the victim "on the butt and said dirty words to her," but no more. Asked if he would take a polygraph, Leatherwood refused, saying he knew he could not pass it.
Hopkins then asked Leatherwood if he would give him a statement "as to what he had told me" and Leatherwood said, "he thought he might ought to talk to a lawyer first." He questioned him no further.
Leatherwood was taken before a magistrate that day who entered two orders, both dated May 3, one appointing Jefferson Blakeley Stewart, the county public defender, to represent him, and the other finding that Stewart had been appointed to defend him, that he was charged with capital rape, and that he had been advised in open court that he was not required to make any statements, that he had a right to counsel, and had the right to communicate with counsel, family or friends, and a right to a preliminary hearing.
At 10:00 p.m. on May 3 Leatherwood was questioned by Jimmy Dale Williams, a detective lieutenant with the Hattiesburg police department. Williams again gave Leatherwood the Miranda warning, and Leatherwood signed the form acknowledgement. Following this Leatherwood gave a confession to having sex with the victim about a year previously, which was incorporated in a written statement he signed. Aside from the confession reduced to writing, he admitted verbally to having sex with the victim three or four times. This statement was notarized by Hedy Lamar Keyes, deputy clerk with the police department.
The grand jury of Forrest County indicted Leatherwood for forcible rape of the victim, in violation of Miss. Code Ann. § 97-3-65(1). Trial began January 27, 1985. At trial he was represented by John Anderson, a successor county public defender to Stewart.

TRIAL
At trial the victim testified that on the afternoon of March 13, 1985, she had gone to Mrs. G.B.'s home, and was there alone, playing with a kick ball. Leatherwood came to the house and asked to borrow some salt. While she was in the kitchen filling a cup with salt, Leatherwood went into the bathroom and the boys' room. When Leatherwood emerged from the room, the victim had kicked the ball under the kitchen table and gone under it to retrieve it. Leatherwood kicked the victim in the back, then tied a blue bandanna around the victim's mouth and then tied her hands to the kitchen table leg. Leatherwood then showed the victim a picture in the "Playboy book" of a naked woman holding her *393 "private parts." Leatherwood then pulled the victim's pants and underpants to her ankles and his pants to his knees. He then put his private parts in her private parts and started going up and down on her. Mrs. G.B. drove up, and Leatherwood said, "Oh, s____" and "I'll finish later." He cut the string from the victim's hands with scissors, and pulled up her pants and his pants. He told the victim he would cut her private parts and her mama's throat if she told. He then left through the back door.
The victim went into the bathroom to wipe the tears from her eyes. She did not tell Mrs. G.B. or any of her family about the assault.
The facts concerning the victim were then related by her family and kin, and by her teachers as above set forth.
Leatherwood's counsel objected to the admission of the victim's statements to third parties. He also objected to the admission of Leatherwood's statements to the police officers, and the circuit judge conducted a hearing in chambers to determine their competency.
Hopkins, Williams and Keyes all testified that the statements Leatherwood had given were free and voluntary, Hopkins and Williams testified he was fully warned as to all Miranda rights. The forms Leatherwood signed contain the entire Miranda litany. Williams testified that he was unaware Hopkins had questioned Leatherwood early that day, and did not know Leatherwood had requested a lawyer.
Leatherwood's counsel called Stewart as a defense witness in the competency hearing. Stewart had a vague recollection of having conferred with Leatherwood in jail at one time. He recognized the May 3, 1985, court order appointing him as attorney for Leatherwood. As best he could recall, he had been informed that Leatherwood had given a statement to the police, and he did "believe" Leatherwood told him that he had given a statement.
Stewart said it was his practice to warn clients not to say anything. He also said that after giving that advice clients would frequently give a statement to the police, anyway.
Leatherwood did not testify before the court in chambers.
The defense objected to the statements, arguing they were given in violation of Leatherwood's Sixth Amendment right to counsel. The circuit judge ruled that the confessions were competent evidence to be considered by the jury.
The State rested, however, without offering them into evidence as part of their case-in-chief.
During trial the defense went to the G.B. home and took pictures of the kitchen table. Mrs. G.B. was called as a defense witness to establish the difficulty in Leatherwood having committed the rape as the victim described. As might be surmised from such a tactic, Mrs. G.B. made a good witness for the State on cross-examination.
Dr. Gillespie was then called as a witness, testifying as above related.
Leatherwood then took the stand in his own defense, and on direct examination denied having had sex with the victim on March 13, 1985. It was apparently the view of Leatherwood's defense counsel that the state's case depended upon whether or not the rape in fact occurred on March 13, 1985.
On cross-examination Leatherwood denied that he had ever had any sexual intercourse with the victim. He was cross-examined at length about his statements to the officers. He admitted the statement he had made to Hopkins. He admitted he was taken before a judge, that the judge read him his rights, and that a lawyer had been appointed for him, who was there in county court with him. The form Miranda acknowledgement Leatherwood had signed before Hopkins was admitted into evidence.
As to Williams' statement, Leatherwood testified that Williams had given him the Miranda warning and that he had waived his rights. He then testified that when Williams questioned him he denied having had sex with the victim until Williams told him:
A. Well, he come [sic]  when he come and introduced hisself [sic] to me *394 and I introduced myself to him, and he said that he'll be working, you know, on this case and he told me that I can get thirty years in prison if I didn't tell him, you know, that I raped her. See I was telling him at the time that I didn't rape her and he said I can get thirty years for saying that, that I didn't rape her.
Q. You could get thirty years for saying you didn't rape somebody?
A. Yes. That's what he told me.
Q. You mean to tell me he was telling you if you don't rape somebody you just get thirty years?
A. He told me that I could get thirty years or he'll make a deal with me. He'll give me thirty years or two weeks in jail.
Q. Or two weeks in jail? So you get thirty years if you don't rape somebody, right?
A. Right.
Q. And you get two weeks if you rape somebody, is that what he said?
A. Yes.
Q. Two weeks in jail for a rape?
A. He told me if I didn't sign a statement I would get thirty years. And he told me if I get it that he can get me out of jail in two weeks.
Q. Did you sign the statement?
A. Yes, I signed the statement.
(R. 680-681)
Leatherwood further testified on cross-examination that he had actually told Williams what the written statement related about his sex with the victim as the state's attorney read from it. He said that he made these statements after Williams had offered him this deal.
He testified that when he gave the statement to Williams he had talked to a lawyer, and that the judge had told him he had a right to remain silent, and that anything he said could be used against him. The reason he made the statement, according to Leatherwood, was the deal offered him by Williams.
Following his testimony the defense rested.
In rebuttal the State first called Hopkins, and the Miranda acknowledgement was admitted into evidence. Hopkins testified that Leatherwood's statement was completely free and voluntary, and he related Leatherwood's oral statement to him about pinching the victim on the "ass" and saying he had talked "dirty" or "nasty" to her.
The State then offered Williams in rebuttal who related that the statement Leatherwood made was after a full Miranda warning, that it was entirely free and voluntary. He denied having made any promises to Leatherwood. He testified that the statement contained word for word what Leatherwood had told him, including the vulgar language. Williams noted that the record showed the questioning began at 10:03 p.m. and concluded at 10:09. The written statement was offered into evidence.
On direct and cross-examination, Williams denied having offered Leatherwood any leniency or help whatsoever in order to get him to make a statement, and specifically denied having offered to get him out in two weeks if he would make a statement. The defense offered no objection to either Hopkins' or Williams' testimony in rebuttal.
This concluded the trial testimony of the guilt phase.
Following argument and instructions by the court, the jury retired and returned a verdict finding Leatherwood guilty as charged.

SENTENCING PHASE
The guilty verdict was handed down by the jury. The court, pursuant to Miss. Code Ann. § 99-19-101 (Supp. 1988), began the sentencing phase of the mandatory bifurcated hearing. Leatherwood, based upon his belief that because no killing had taken place capital punishment could not be imposed, made a motion for the jury to be dismissed and a sentence to be imposed by the court. After vigorous argument over the constitutionality of the death penalty as *395 possible punishment for Leatherwood, the court overruled Leatherwood's motion.
The trial court, upon the motion of the State, incorporated all the evidence presented during the guilt phase of the trial and the sentencing phase.
The State then presented the testimony of Ellen Aldridge, a civilian investigator with the Hattiesburg Police Department. Ms. Aldridge testified about her observation of the victim on May 2 at Forrest General Hospital. She relayed to the jury that the victim was "extremely upset" and "obviously traumatized." Ms. Aldridge also testified that the victim had told her that Alfred Dale Leatherwood had assaulted her. Ms. Aldridge continued by relaying the details of the assault as told to her by the victim and Leatherwood's threats to kill the victim and her mother. Ms. Aldridge not only relayed the general threats, but also emphasized that Leatherwood had graphically told the victim that he would cut her up in "pork chop pieces" and would start cutting from her genital area on up. Ms. Aldridge also stated her observation that the victim was still in fear of Leatherwood getting out of prison. To alleviate the victim's fear, Ms. Aldridge had taken the victim to the Forrest County Jail to see that Leatherwood was still there.
The State then rested.
Leatherwood called Jimmy Lee Gaddis (Gaddis) as a character witness. Gaddis testified that he had known Leatherwood 18 or 20 years and that he was a very fine young man. He further stated that to his knowledge Leatherwood did not have a reputation for violence in the community.
The defense then rested.
After closing argument by respective counsels, the jury deliberated for just less than one and one-half hours. After their deliberation, the jury returned with the verdict:
"We, the Jury, unanimously find that the aggravating circumstances of:
1) heinous
2) atrocious
3) cruel conduct
and that they are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances and we unanimously find that the Defendant should suffer death."
(R. 929)
Leatherwood then filed all the proper motions before the trial court. The trial judge overruled the motions whereupon Leatherwood appealed to this Court.

LAW

I. CONFESSION
Leatherwood argues that the introduction of his confession to Williams violates both his Fifth and Sixth amendment rights because it was given following his requesting an attorney, and the interrogation was initiated by Williams.
The U.S. Supreme Court in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), promulgated a formula, a "bright line rule" for determining whether a confession is free and voluntary.
We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
451 U.S. at 484-486, 101 S.Ct. at 1884-1885, 68 L.Ed.2d at 386.
The Court held that questioning in violation of this rule was a per se violation of an accused's Miranda rights under the Fifth Amendment that no accused should be compelled to give evidence against himself.
Then in Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Court applied the same "prophylactic rule" where an accused during arraignment requested an attorney, and was thereafter interrogated by the police, holding such questioning to be in violation of the accused's Sixth Amendment rights to counsel.
*396 This bright line, or prophylactic rule has been further delineated in other Supreme Court decisions, namely: Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); Shea v. Louisiana, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985); Solem v. Stumes, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984); Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).
No purpose is served by further analysis of the Court's decisions, or criticism of its application by dissenting members. Suffice it to say that the Court has fashioned a certain rigid formula whereby a trial court is obligated to determine whether a confession is competent following an accused's request for an attorney. If the defendant passes this test, then the confession is automatically excluded from being introduced by the State, at least as a part of its case-in-chief. On the other hand, if the test is not met, the trial court determines whether the confession was freely and voluntarily given under all the Miranda standards and our rules of evidence.
This Court will, of course, scrupulously adhere to the mandate of the U.S. Supreme Court.
Leatherwood's sole basis for attack is that the confession to Williams violates the Edwards rule. He gives no other reason for excluding it.
It is clear, however, that Leatherwood has failed to meet the test of Edwards. At the time of his questioning by Williams, and contrary to the situation existing in Edwards and Jackson, the State had made counsel available to Leatherwood. Jefferson B. Stewart had been appointed to defend Leatherwood during the day of May 3, 1985. The record does not reveal what Stewart advised Leatherwood, but presumably he advised him of his rights. (Vol. IV, pp. 571-72) State's Exhibit 3 is a copy of the order of County Court Judge Michael W. McPhail in compliance with Rule 1.04 of our Criminal Rules of Procedure, finding that Leatherwood appeared in his court on May 3, 1985, represented by Stewart, and being fully informed of his Miranda rights.[1]
Exhibit 4 is a copy of an order by Judge McPhail on the same date appointing Stewart as Leatherwood's counsel.
Beyond this, in this state we have a well-recognized procedure whereby the competency of a confession or admission by an accused to a criminal offense may be determined by the circuit judge in chambers. At such a hearing the State is required to make a prima facie showing that the confession is free and voluntary. If the State makes such a showing, it is then incumbent upon the defendant to offer evidence in support of any reason he has for objecting to the admission of the confession. If he fails to do so, he cannot thereafter complain of its inadmissibility on some evidentiary basis which he failed to *397 present in chambers, when he had an opportunity to do so. Cf. Kelly v. State, 493 So.2d 984 (Miss. 1986); Hemingway v. State, 483 So.2d 1335 (Miss. 1986); Tolbert v. State, 511 So.2d 1368 (Miss. 1987); Lockett v. State, 517 So.2d 1317 (Miss. 1987).
In this case Leatherwood did not testify in chambers. The only witness he offered was Stewart, who neither disputed nor refuted any of the State's evidence. The record shows that before Leatherwood gave his confession he signed a form acknowledging he had been given all Miranda warnings, including the following:
4. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.
5. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.
6. If you decide to answer questions now without a lawyer present, you will have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
* * * * * *
WAIVER OF RIGHTS: I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kinds has been used against me.
s/Alfred Leatherwood
State's Exhibit 4.
Williams also testified that he had fully given Leatherwood all Miranda rights, including his right to have an attorney present before making any statement. With this evidence before him undisputed, the circuit judge was fully warranted in finding Leatherwood had knowingly and intelligently waived his Sixth amendment right to counsel. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).
No trial judge should be faulted for concluding under these facts that an accused had intelligently waived his right to counsel. Why should a court be inquired to delve further? If Leatherwood had not indeed knowingly waived his right to have his attorney present when Williams questioned him, he had the opportunity to say so at the hearing in chambers.
Moreover, even though the circuit judge held the confession freely and voluntarily given, and competent as evidence, the State made no attempt to introduce it as part of its case-in-chief. On cross-examination by the State, Leatherwood admitted he had been furnished a lawyer by the State on the morning of May 3, that the lawyer was with him when he appeared before the county court judge, and the lawyer had talked to him. He also admitted that prior to the confession Williams had told him that he had a right to a lawyer, and that he understood his rights.
When Leatherwood testified, the only reason he gave for attacking the credibility of the confession was that it was a result of a deal Williams made with him to reduce his imprisonment to two weeks, a charge he does not maintain on his appeal.
Then, in rebuttal Williams denied promising Leatherwood anything to get the confession, and the confession was introduced without objection into evidence before the jury. The assignment of error is therefore without merit. There was no Edwards violation, but even so the evidence in this case is uncontradicted that Leatherwood manifestly knowingly waived his right to have his attorney present when he confessed to Williams, and finally, the confession was offered without objection as impeachment. United States ex rel. Adkins v. Greer, 791 F.2d 590 (7th Cir.1986); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); Oregon v. Haas, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); U.S. v. McManaman, 606 F.2d 919 (10th Cir.1979).

II. THE VICTIM'S STATEMENTS
Leatherwood next assigns as error the admission into evidence over his objection of all the hearsay statements made by the *398 victim, including the May 20 handwritten note. For legal reasons other than those assigned, we agree that some of them were not competent.
Trial began January 27, 1986, after the January 1, 1986, effective date of the Mississippi Rules of Evidence (MRE),[2] Rule 802 states: "Hearsay is not admissible except as provided by law." The comment states Rule 802 is a statement of existing common law.
The victim having testified as a witness, the admissibility of the hearsay statements made to various persons was governed by Rule 803, "Hearsay Exceptions: Availability of Declarant Immaterial." Rule 803 begins: "The following are not excluded by the hearsay rule, even though the defendant is available as a witness: ..."
And, 803(4) provides:
(4) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
This rule and its comment made the victim's statements to Dr. Walker, the emergency room physician, to Dr. Magee, and to Dr. Gillespie admissible, such statements all being reasonably necessary for her diagnosis and treatment.
The victim's statements to Linda Moore, a qualified expert in child behavior, fall outside Rule 803(4) for the reason that the services she rendered the victim were not generically medical. In Hall v. State, 539 So.2d 1338, 1342 n. 8 (Miss. 1989), we "resist[ed] the temptation to elasticize our Rule 803(4), hearsay exception beyond the diagnosis and treatment of matters medical." Hall held that statements of one such as the victim made to a social worker likeunto Moore were not admissible under Rule 803(4). Paraphrasing, Moore sought to aid and counsel the victim, but she was not a physician nor may the services she rendered be stretched into the world of the medical. Hall, 539 So.2d at 1342, citing Cassidy v. State, 74 Md. App. 1, 536 A.2d 666, 678-89, (1988) To like effect is Mitchell v. State, 539 So.2d 1366, 1371 (Miss. 1989).
The remaining hearsay testimony of statements made by the victim must be evaluated upon remand.

A. Pre-Rules
Prior to the adoption of the Rules of Evidence, as noted in Gill v. State, 485 So.2d 1047 (Miss. 1986), in child sex abuse cases, we had broadened the hearsay exception beyond that already allowed in rape cases involving females over the age of puberty. Anderson v. State, 82 Miss. 784, 788, 35 So. 202, 203 (1903). In Gill, following Williams v. State, infra, we found no error in admitting testimony that a twelve-year-old child ran out of the house and told the next door neighbor that her stepfather had just raped her.
In Williams v. State, 427 So.2d 100 (Miss. 1983), an eleven-year-old child was raped by her stepfather, and we found no error in the admission into evidence of statements made to her older sister the next morning that she had been raped, as well as to a local minister who the police had asked to take the child to the hospital for examination. In that case the child's statements as to who committed the crime were not offered to the jury, however. We adopted the Michigan rule, stated in People v. Mikula, 84 Mich. App. 108, 116, 269 N.W.2d 195, 199 (1978):
Hearsay testimony concerning the details of a complaint of sexual assault is admissible where the complainant is of "tender years" if her statement is shown to have been spontaneous and without indication of manufacture, and if any delay is making the complaint is excusable insofar as it is caused by fear or other equally effective circumstances.
427 So.2d at 102-103.
Thereafter, in Cunningham v. State, 467 So.2d 902 (Miss. 1986), a rape case with *399 an adult victim, we broadened the hearsay exception in such cases by holding that where the usual criteria for admitting hearsay testimony of a rape victim were met, it was not objectionable that the victim's statement also identified the attacker.
It would appear that the statements the victim made to Mrs. Patsy Smith, and to Mrs. Downey on April 30 and May 1, 1985  as well as her handwritten note insofar as relevant  were admissible under the tender years exception we adopted in Williams, supra, and Gill, supra. There was a plausible reason for the delay in making a complaint. We note that in Hunt v. State, 44 Ala.App. 479, 213 So.2d 664 (1968), the Alabama Court of Appeals found no error in admission of a statement made by a child victim nine months after incest committed by her father. For the same reason, the victim's statements made on May 1 to her sister, her uncle and her aunt, who went to the school and took her home; and to her mother, Mrs. V., and her aunt, Mrs. G.B., when she got home, would have been competent under this exception. All these statements were embraced in a continuing recitation by the victim to her teachers and family of sexual assault made on her by Leatherwood six weeks previously.
It is doubtful that the statement the victim made to Mrs. Valmena Smith Blackmon on May 20 following, and the note the victim wrote, qualified under our pre-rules decisions. Likewise, the statements she made on May 2 to her grandmother, probably did not meet the tender years exception. These are points unnecessary for us to decide, however, in view of the conclusion we have reached.

B. Rule 803
Unfortunately for the State's position, Rule 1103 of the Rules of Evidence provides:
All evidentiary rules, whether provided by statute, court decision or court rule, which are inconsistent with the Mississippi Rules of Evidence are hereby repealed.
We cannot, therefore, rely upon Williams, supra, or Gill, supra, but must resort to Rule 803 to determine whether these remaining statements of the victim's were admissible. Mitchell v. State, 539 So.2d 1366, 1369 (Miss. 1989).
Following the decision of People v. Mikula, supra, the Michigan Supreme Court adopted the Michigan Rules of Evidence, quite similar, as ours, to the Federal Rules of Evidence. In the case of People v. Kreiner, 415 Mich. 372, 329 N.W.2d 716 (1982), the Michigan Supreme Court held that the "tender years exception to the hearsay rule" of that state no longer existed, and any such statements, if admissible at all, would be admissible only under existing exceptions under the Michigan Rules of Evidence. 329 N.W.2d 717. In that case the trial court admitted, under the tender years exception, testimony by a mother of statements made to her by her daughter the day following a sexual molestation the previous night in their home. The Michigan Supreme Court reversed and remanded for the trial court to determine whether the testimony was admissible under that state's Rule 803(2), which is the same as ours:
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
Because Michigan had no counterpart to our Rule 803(24), the Supreme Court specifically pointed out that it had no occasion to determine whether this testimony would have been admissible under this 24th exception, which appears in the Federal Rules of Evidence and in the Mississippi rules.
We cannot even hold the possibility, as did the Michigan Supreme Court, that the statements made by the victim some six weeks later qualified under 803(2). Statements made by her some six weeks later simply cannot qualify as having been made "while the declarant was under the stress of excitement caused by the event." Mitchell v. State, 539 So.2d at 1369-70; Hall v. State, 539 So.2d at 1342.
Nor did such statements qualify under Rule 803(3):

*400 (3) Then Existing Mental, Emotion, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
See Hall v. State, 539 So.2d at 1342.
Our Rule 803(24) provides for additional, residual exceptions:
(24) Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
We note at the outset that the State failed to give Leatherwood's counsel advance notice prior to trial that it planned on offering this evidence, as required by the Rule.
Just as the trial court in People v. Kreiner, supra, did not address the admissibility of the hearsay statements under Rule 803, but looked solely to the Michigan pre-rules tender years exception, the circuit judge in this case did not consider whether the victim's statements were admissible under Rule 803, but resorted only to our tender years exception of Williams, supra. This is understandable, the MRE having been in effect only one month at the time of trial. Even the State's brief does not address the admissibility of these hearsay statements under Rule 803, confining its argument as to admissibility solely to the tender years exception of Williams, supra.
There being no specific tender years exception set out in Rule 803, and the circuit court having never addressed the question of whether the statements made by the victim to her teachers and family were embraced in Rule 803(24), it is necessary that we reverse. Mitchell v. State, 539 So.2d at 1369-71. It was incumbent upon a trial judge from the court proceedings before him to first make a determination and finding that hearsay testimony not otherwise admissible under Rule 803 could qualify under the residual exceptions of 803(24). See: Hall v. State, 539 So.2d at 1342-43; Cummins v. State, 515 So.2d 869, 873 (Miss. 1987).
Even if the circuit court had made an evaluation as to whether these hearsay statements were admissible under Rule 803(24), it is clear from the record made that the statements and handwritten note of the victim made May 20 to Mrs. Blackmon were not competent under Rule 803(24), as we will discuss below, and it was reversible error to admit them, upon the record made.
What follows are some basic, generalized guides for the circuit judge on remand which we do not suggest are all inclusive. We have discussed these points in Mitchell v. State, 539 So.2d at 1370-71 and in Hall v. State, 539 So.2d at 1342-43, but take this occasion to elaborate further.
The Wisconsin Rules of Evidence, as interpreted by the Wisconsin Supreme Court, indicate that hearsay statements made by a sexually abused child are admissible under that state's Rule 803(24). Mitchell v. State, 84 Wis.2d 325, 332, 267 N.W.2d 349, 352 (1978); Bertrang v. State, 50 Wis.2d 702, 184 N.W.2d 867 (1971).
Also, in U.S. v. Cree, 778 F.2d 474 (8th Cir.1985), the 8th Circuit Court of Appeals found that statements of a four-year-old child to a social worker were admissible *401 under 803(24) of the Federal Rules of Evidence. That court held:
A statement not specifically covered by [the exceptions in Fed.R.Evid. 803(1) to (23)] but having equivalent circumstantial guarantees of trustworthiness [is not excluded by the hearsay rule even if the declarant is available as a witness], if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of [the Fed Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant. Fed.R.Evid. 803(24). Thus, "[t]here are five requirements for admission under Rule 803(24): (1) trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice." Moffett v. McCauley, 724 F.2d 581, 583 (7th Cir. 1984); see also J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 803(24)(01), at 803-372 to -381 (1984). The trial court is entitled to a "`considerable measure of discretion' in deciding whether to admit hearsay evidence under Rule 803(24)," 724 F.2d at 583, and its "determination of admissibility of evidence under Rule 803(24) will not be overturned on appeal except for an abuse of discretion." United States v. Friedman, 593 F.2d 109, 118 (9th Cir.1979).
[Brackets in original opinion]
778 F.2d at 476-77.
A detailed examination of the factors to be considered under Rule 803(24) are set forth in J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 803(24)(01), at 803-369  383 (1984), which should be studied by any trial judge confronted with admitting testimony such as involved in this case. The drafters of the Federal Rules of Evidence recognized that something more than the 23 specific exceptions set forth in Rule 803 was needed, and the residual exception of 803(24) was created for situations not clearly embraced in the others.
Rule 803(24) as promulgated by the Supreme Court represented a compromise. It recognized that not every contingency can be treated by detailed rules, that the hearsay rule has never been a closed system and should not be (for it would be pre-sumptuous to assume that all possibilities and new developments have been foreseen), and that, in a particular case, hearsay evidence which does not fall within one of the exceptions may have greater probative value than evidence which does.
Weinstein, 803-369.
That authority further states:
Rule 803(24) requires five findings by the trial court. They should be made explicitly on the record, unless there is a waiver explicitly, or by silence, or the basis for the ruling is obvious.
Weinstein, 803-373.
In summary, these five findings by the trial court are:
1. The statement must have "circumstantial guarantees of trustworthiness" "equivalent" to those in Rules 803(1) to (23). Under this heading, "Need is a proper factor to be considered because of the basic assumption underlying the hearsay rule that statements made directly in the courtroom are more reliable."
Id., XXX-XXX-XXX.
2. The statement "is offered as evidence of a material fact."
Id., 803-378.
3. The statement must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."
Id., 803-378.
4. Admissibility must accord with "the general purposes of these rules and the interests of justice."

*402 5. The proponent must give notice of his intention to offer the statement "sufficiently in advance of trial or hearing to provide ... afair opportunity to meet it ... and the particulars ... including the name and address of the declarant."
Id., 803-379  380.
As we noted above, even if this Court could somehow hold from the record that the statements made by the victim on April 30 and May 1 somehow qualified as an 803(24) exception  which we cannot  it is clear the present record shows the victim's statements and handwritten note on May 20 to Mrs. Blackmon did not qualify under Rule 803(24). There was no showing of need for such hearsay evidence, or that the evidence was "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."
The admittedly difficult analysis encompassed in 803(24) does not end with this rule, even. The Sixth Amendment right of an accused to be confronted with the witnesses against him must be observed. U.S. Constitution, Amendments VI and XIV; Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); Coy v. Iowa, ___ U.S. ___, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); see also Miss. Const. Art. 3, § 26 (1890). We see no confrontation clause problem in this case because the victim did testify. Such problem might very well occur if she failed to testify upon remand, however.
On the "sufficient guarantees of trustworthiness" of the victim's hearsay statements, a proper consideration for the court will be the behavior of the victim and her own mental and emotional condition as indicative of having undergone some severe emotional trauma such as sexual abuse. In considering the admissibility of testimony of this nature, a court must be extremely careful that on the one hand the rights of a defendant are protected under the witness confrontation clauses of the federal and state constitutions and our rules of evidence, and, on the other hand, that testimony which on balance should be admitted under the framework of our rules of evidence is not excluded.
The victim's statements were made under a variety of circumstances. Determining the admissibility of each of these statements unquestionably will be difficult for the circuit court. We know of no way to make the circuit judge's task easier, however. The circuit court must carefully apply the standards given to each hearsay statement that the State offers in evidence, following the required advance notice by the State to the defense of which statements it plans to offer during trial.

III. MAXIMUM SENTENCE
Although we are reversing, it is necessary that we address the maximum sentence authorized by law under the facts of this case.
Leatherwood argues that the imposition of the death penalty for rape violates the Eighth Amendment of the U.S. Constitution prohibiting the infliction of "cruel and unusual punishments" under Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
We need not address the question of whether Coker, supra, would be applicable to the rape of a child, or this Constitutional question, because it is clear that Miss. Code Ann. § 99-19-101 (Supp. 1988) precludes imposition of the death penalty.
Miss. Code Ann. § 97-3-65 (Supp. 1988), in effect at the time this crime was committed, authorized the imposition of the death penalty upon conviction of carnally knowing a female child under 12 years of age:
(1) Every person eighteen (18) years of age or older who shall be convicted of rape by carnally and unlawfully know a female child under the age of twelve (12) years, upon conviction shall be sentenced to death or imprisonment for life in the State Penitentiary.
Miss. Code Ann. § 97-3-65 (Supp. 1985)
Miss. Code Ann. § 1-3-4 (Supp. 1988) provides:

*403 The terms "capital case," "capital cases," "capital offense," "capital offenses," and "capital crime" when used in any statute shall denote criminal cases, offenses and crimes punishable by death or imprisonment for life in the state penitentiary. The term "capital murder" when used in any statute shall denote criminal cases, offenses and crimes punishable by death, or imprisonment for life in the state penitentiary.
Miss. Code Ann. § 99-19-101 (Supp. 1988), in effect at the time of the commission of this crime, provides in pertinent part:
(1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment... .
(2) After hearing all the evidence, the jury shall deliberate on the following matters:
(a) Whether sufficient factors exist as enumerated in subsection (7) of this section;
* * * * * *
(3) For the jury to impose a sentence of death, it must unanimously find in writing the following:
(a) That sufficient factors exist as enumerated in subsection (7) of this section;
* * * * * *
(7) In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) The defendant actually killed;
(b) The defendant attempted to kill;
(c) The defendant intended that a killing take place;
(d) The defendant contemplated that lethal force would be employed.
The trial judge, apparently of the view that subsection (7) of Miss. Code Ann. § 99-19-101 (Supp. 1988) was inapplicable to this rape case, did not submit this issue to the jury during the sentencing phase.
There was no proof offered that Leatherwood met any of the conditions of subsection (7) of this statute, and we must therefore hold that under present statutory authority the maximum punishment upon conviction of this crime is life imprisonment.
In view of our holding, it is unnecessary that we address any of the remaining assignments of error.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., and SULLIVAN, J., concur.
PRATHER and ROBERTSON, JJ., concur in parts I and II and in the result only in part III.
HAWKINS, P.J., dissents.
DAN M. LEE, P.J., dissents as to maximum sentence only in part III, otherwise, concurs.
PITTMAN and BLASS, JJ., not participating.
ROBERTSON, Justice, concurring:
I, too, am of the view that the maximum punishment to which one convicted of rape under Miss. Code Ann. § 97-3-65(1) (Supp. 1987) may be exposed is life imprisonment. I would have preferred that the point be put on another ground  one that ends once and for all the debate whether rape may be punished by death. I would prefer that we hold forthrightly that so much of Section 97-3-65(1) as authorizes imposition of the punishment of death for rape of a child under fourteen may not be enforced consistent with the Eighth Amendment to the Constitution of the United States.
In his most famous dissent, Holmes perceived "every opinion tends to become a law." Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937, 949 (1905). Holmes added that the Constitution should not be "perverted ... to prevent the natural outcome of a dominant opinion." Id.
Holmes' heresy has become accepted Eighth Amendment jurisprudence as in no other area, our overarching referent being "the evolving standards of decency that *404 mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958). Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), decreed that we identify the nation's opinion through two institutional forms of moral and political expression: the actions of popularly elected legislatures and the verdicts of juries. Gregg's refusal to declare the death penalty unconstitutional per se was in substantial part predicated upon legislative and jury approval of the punishment.
To be sure, the opinions so expressed have few geographical or temporal limitations. Whatever tolerance our federal system may allow for diversity among the states in other areas, the opinion which tends to become federal constitutional law here is a national opinion to be garnered from a collective study of the actions of the states and their juries in the aggregate.
Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), employed this view on the question whether death was a constitutionally permissible punishment for the rape of an adult woman. See Coker, 433 U.S. at 593-97, 97 S.Ct. at 2866-2869, 53 L.Ed.2d at 990-92. Summarizing fifty years of history, Coker recognized that in the last ten years only six states had maintained statutes authorizing the death penalty for rape: Georgia, North Carolina, Louisiana, Florida, Tennessee and Mississippi. Subsequent to 1976 and the decisions in Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), North Carolina and Louisiana had revised their death penalty statutes and had excluded rape as a crime subject to the punishment. Florida, Tennessee and Mississippi authorized the death penalty only where the rape victim was a child and the rapist was an adult. The Tennessee statute was invalidated by that state's supreme court. Collins v. State, 550 S.W.2d 643 (Tenn. 1977). In short, when Coker was decided, only three jurisdictions authorized the death penalty for rape: Georgia, Florida and Mississippi. The Coker plurality concluded that this fact
obviously weighs very heavily upon the side of rejecting capital punishment as a suitable penalty for raping an adult woman.
433 U.S. at 596, 97 S.Ct. at 2868, 53 L.Ed.2d at 991-91.
Coker, of course, struck down the Georgia statute. Thereafter, the Florida Supreme Court declared the death penalty unconstitutional for the crime of rape in that state. Buford v. State, 403 So.2d 943, 951 (Fla. 1981). Mississippi now stands alone as the only state authorizing death as a penalty for rape of any kind.
The second institutional form of expression of public opinion  jury verdicts  was also found to support unconstitutionality. Coker concluded that "in the vast majority of cases, at least nine out of ten, juries have not imposed the death sentence [for rape]." 433 U.S. at 597, 97 S.Ct. at 2868, 53 L.Ed.2d at 992. Coker thus held the Georgia statute authorizing the penalty of death for the crime of rape of an adult woman unconstitutional in violation of the cruel and unusual punishment clause of the Eighth Amendment, as made enforceable against the states by the Fourteenth Amendment.
The Coker pattern of analysis was continued in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In Enmund, the question was whether the penalty of death could be imposed consistent with the Eighth Amendment in cases involving common law felony murder, that is, where the defendant was a participant in a felony in the course of which a victim was murdered but where the defendant did not himself kill, attempt to kill, or intend to kill. Following Gregg and Coker, Enmund allowed longstanding widely held national public opinion to inform its constitutional decision. Enmund, 458 U.S. at 788-96, 102 S.Ct. at 3372, 73 L.Ed.2d 1140, 1146-51. The Enmund Court found that "only a small minority of jurisdictions  eight  allow the death penalty to be imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed." 458 *405 U.S. at 792, 102 S.Ct. at 3374, 73 L.Ed.2d at 1148. This factor was found to "weigh on the side of rejecting capital punishment for the crime at issue." 458 U.S. at 793, 102 S.Ct. at 3374, 73 L.Ed.2d at 1149.
Turning to the conduct of juries, the Enmund Court saw a similar expression of opinion, finding that
The evidence is overwhelming that American juries have repudiated imposition of the death penalty for crimes such as Petitioner's.
458 U.S. at 794, 102 S.Ct. at 3375, 73 L.Ed.2d at 1150. Enmund declared the death penalty impermissible except where the defendant himself kills, attempts to kill or intends to kill.
This idea of informing the content of the Eighth Amendment by a look out the window at what legislatures and juries are doing has been further institutionalized via Stanford v. Kentucky, ___ U.S. ___, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); Penry v. Lynaugh, ___ U.S. ___, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); Thompson v. Oklahoma, 487 U.S. ___, ___, 108 S.Ct. 2687, 2692-98, 101 L.Ed.2d 702, 711-17 (1988); McCleskey v. Kemp, 481 U.S. 279, 300, 107 S.Ct. 1756, 1770-1771, 95 L.Ed.2d 262, 283-84 (1987); Tison v. Arizona, 481 U.S. 137, 154, 107 S.Ct. 1676, 1686, 95 L.Ed.2d 127, 141-42 (1987); and Ford v. Wainwright, 477 U.S. 399, 408-09, 106 S.Ct. 2595, 2601, 91 L.Ed.2d 335, 346 (1986). The Attorney General was only being candid when at oral argument he conceded the point, though not the result which may only follow. Still, I should have thought the matter ended. Seen in this light, our case may have but one outcome. Mississippi is the only state left which authorizes the penalty of death for rape of any kind. Alfred Dale Leatherwood is the only person in the United States today who resides on death row by virtue of a jury's determination that he should be executed for the crime of rape. Solem v. Helm, 463 U.S. 277, 300, 103 S.Ct. 3001, 3015, 77 L.Ed.2d 637, 655 (1983) is as close a precedent as one may find when it strikes down a South Dakota life without parole recidivism sentence because "[i]t appears that [petitioner] was treated more severely than he would have been in any other state."
Far more convincingly than in Gregg, or Coker or Enmund, or any of the others, the American public has spoken  through its legislatures and juries. That public has told us that, however heinous it may regard the rape of a child, death is not an acceptable punishment. In urging that we declare that punishment constitutionally impermissible in this state, I would do no more than accept that in this instance public opinion has become law.
There is a second, arguably independent, reason why imposition of the death penalty for rape violates the Eighth Amendment. I refer to the Amendment's proportionality command. That the severity of punishment should be in proportion to the seriousness of the offense derives from the retributive theory of punishment. See H.L.A. Hart, Punishment and Responsibility, 230-37 (1968); Wilhelm, Recidivist Statutes  Application of Proportionality and Overbreadth Doctrines To Repeat Offenders, 57 Wash.L.Rev. 573 (1982); Note, Disproportionality In Sentences Of Imprisonment, 79 Col.L.Rev. 1119 (1979); and Dressler, Substantive Criminal Law Through The Looking Glass Of Rummel v. Estelle: Proportionality and Justice As Endangered Doctrines, 79 Col.L.Rev. 1119, 1121 (1979).
In Coker, a plurality of the Supreme Court stated that a punishment is constitutionally excessive if it
(1) makes no contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering or (2) is grossly out of proportion to the severity of the crime.
See also Weems v. United States, 217 U.S. 349, 371, 30 S.Ct. 544, 551, 54 L.Ed. 793, 800 (1910) (Eighth Amendment protects "against all punishments, which by their excessive length or severity, are greatly disproportioned to the offenses charged."); Enmund v. Florida, 458 U.S. 782, 788, 102 S.Ct. 3368, 3372, 73 L.Ed.2d 1140, 1146 (1982); and Rummel v. Estelle, 445 U.S. *406 263, 271-72, 100 S.Ct. 1133, 1137-1138, 63 L.Ed.2d 382, 389 (1980).
In Solem v. Helm, 463 U.S. 277, 292, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637, 650 (1983), the Supreme Court identified three Factors that should guide courts in determining whether the sentence meets Eighth Amendment standards:
(1) The gravity of the offense and the harshness of the penalty;
(2) the sentences imposed on other criminals in the same jurisdiction; and
(3) the sentences imposed for commission of the same crime in other jurisdictions.
Taking the third point first, we are confident there is no person "in other jurisdictions" who is under a death sentence for child rape for the obvious reason that there is, to our knowledge, no other state whose law authorizes such. Second, insofar as we are aware Alfred Dale Leatherwood is the only person this state has sentenced to die for capital rape.
Finally, the punishment simply does not fit the crime. Rape is a vile deed deserving of damnation but short of death. However heinous or offensive child rape may be  and is, the victim's life is not taken. Though the victim may hardly forget her nightmarish experience, sensitive response by family, friends and competent professionals may often assure recovery so that in time the victim comes to lead a quite scarred though quite liveable life. In this sense the harshness of the death penalty is qualitatively greater than the gravity of the offense.
And as a footnote, I find it not without relevance that one may search the feminist literature on the subject of rape and find not the first argument that our society ought execute rapists. See, e.g., Brownmiller, Against Our Will, 379-80 (1975); Estrich, Rape, 95 Yale L.J. 1087 (1986).
One more point and I am done. There is as much chance of the Supreme Court sanctioning death as a penalty for any non-fatal rape as the proverbial snowball enjoys in the nether regions, as that said above if believed makes clear. Where, as here, that Court declares skeletal principles it falls our lot to flesh out the body. Today's hot potato sidestep ill befits our role as a responsible partner in the American federal system. I would hold that infliction of the punishment of death for the crime of rape even where the victim is a child may not be done consistent with the cruel and unusual punishment clause of the Eighth Amendment made applicable to the states via the Fourteenth Amendment. So much of Miss. Code Ann. § 97-3-65(1) (Supp. 1987) as provides to the contrary should be declared unconstitutional and void and of no further force and effect.
PRATHER, J., joins in this opinion.
PITTMAN and BLASS, JJ., not participating.
HAWKINS, Presiding Justice, dissenting:
In reversing this case, I would avail this Court of the golden opportunity it has to outright overrule Hall v. State, 539 So.2d 1338 (Miss. 1989), and Mitchell v. State, 539 So.2d 1366 (Miss. 1989), insofar as it (as does Hall) totally excludes the Legislative Branch of our Government from any Constitutional authority to enact laws dealing with evidence and practice in trial courts.
Instead, the majority sets these cases in judicial concrete, citing them as authority.
I would overrule Hall and Mitchell and direct the circuit court on remand to follow the Child Abuse Evidence Act, Miss. Code Ann. § 13-1-401, et seq. insofar as applicable to the evidence presented on retrial.
These two decisions, now buttressed with the majority opinion in this case, ignore history, undermine our Constitution, and have set this Court on a collision course with the Legislative Branch of our State. Moreover, they have placed an entirely unnecessary burden upon the State in prosecuting child sexual abuse cases. This has been stated in the dissents in Hall and Mitchell.
Other information has been received since these decisions, however, which bears recitation.
*407 Let me say that I am quite cognizant that when this Court announces a rule of law, I am duty bound to follow it, even though I disagree. Yet, while I am duty bound to follow this Court even when I believe it is mistaking the law, I am not duty bound to follow the majority when I am convinced it is violating the law. To the contrary, I am duty bound to resist it to the best of my ability.
In telling the Legislative Branch it had no more authority to enact the Child Abuse Evidence Act than would a board of supervisors, and in pre-empting exclusive authority in this Court to adopt (enact) these rules of evidence, I am convinced the Court is actively engaged in a course of conduct not permitted by, and in fact prohibited by our Constitution. I cannot, at least while I am a member of this Court, permit this abuse of power to go unchallenged.
Before Hall was considered by this Court, the Legislative "incompetence" to enact statutes on procedure and evidence, such as the Child Abuse Evidence Act, was expressed by a member of this Court in the Mississippi College Law Review: Robertson, "Discovering Rule 11 of the Mississippi Rules of Civil Procedure," Miss.Coll. L.R., Vol. 8, No. 2, p. 111, Spring Issue 1988. Statutes of the Legislature duly enacted and signed into law by the Governor dealing with court practice and evidence were declared in that article, "quite arguably beyond its legislative authority,"[1] "well beyond legislative competence,"[2] and this Court should "ignore any such restrictions in coverage emanating from the legislative enactment."[3] Any standard in such a legislative Act "should be disregarded."[4] "While we need all the help we can get from others, in the end the judicial authority should be neither shared nor abdicated." [Emphasis added][5]
The Child Abuse Evidence Act was one of the enactments the author declared beyond legislative competence.[6]
Thus did the author inform the Legislature it had no competence to pass procedural or evidentiary statutes. The author did, however, graciously grant the Legislature the exalted status of a supplicant to this Court. By going through us it might, after all, get a law (rule) enacted. And, how should the Legislature communicate its concerns to this Court? The author replied, "I answer, if formality is desired and appropriate, pass a resolution; if informality will suffice, pick up the telephone."[7]
Thereafter, Hall was presented to this Court for decision. The circuit court had used the Child Abuse Evidence Act in admitting testimony at trial. The Legislative "competence" to enact this statute was not raised by the attorneys for either side during trial of the case. Nor, was the Legislative "competence" to enact this statute raised by the parties on appeal. The circuit judge, the district attorney, the defense counsel, and the Attorney General entertained no doubts as to the authority of the Legislature to enact such statute, or the Governor to sign it into law.
We raised the question ourselves. Then we answered it precisely as previously predicted in the law journal article. Thus did we in Hall, and thus do we continue to grossly insult the Legislative Branch of our Government.
We did not even show the Legislature the courtesy of calling upon it for a response, to get its views, before slamming the door in its face.
Absolute impartiality is the keystone to any judicial decision, especially one emanating from the highest Court in this State. There should be no question but that the sitting judge has no interest whatsoever, direct or indirect, in the decision. Aside from my strong disagreement as to the law, I have a serious ethical problem with the course of conduct inaugurated under *408 Hall and Mitchell. And, aside from prejudgment of the matter via a law journal article in one of our state's law schools, this Court is taking power from the Legislature and Governor, and placing it solely in the members of this Court. The members of this Court have a direct interest in this result. We are the self-declared recipients of power, the other two branches the losers of any such power. And, we and we alone are the ones who decide whether we shall grant such power unto ourselves. How can these be perceived as impartial? Especially since we declared ourselves the winner. Jenkins v. Forrest County General Hospital, 542 So.2d 1180, 1181-1182 (Miss. 1989).
Under Article 6, § 146 of our Constitution, this Court's function and jurisdiction is a court of appeals:
Section 146. The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals and shall exercise no jurisdiction on matters other than those specifically provided by this Constitution or by general law. [Emphasis added]
This is our obligation to this State and its people. We are the only court of appeals. This is a big job. To decide cases on appeal, we must have the utmost in confidentiality and secrecy. The foundation of any decision rests upon the absolute freedom of each member of this Court to express his views to the others, whether orally or in writing, assured that they will remain inviolate. Only the final opinion, or opinions, are made public.
How radically different is the role of legislating. When we as the sole source of power adopt (enact) rules of practice or evidence, we are engaged in a course of public conduct no different from any other public body. We are legislating. Surely, the press and the public are entitled to be present, to hear our debates and conference discussion. After our decisions in Hinds County Board of Supervisors v. Common Cause, 551 So.2d 107 (1989); Mayor and Board of Aldermen of Vicksburg v. Vicksburg Printing and Publishing, 434 So.2d 1333 (Miss. 1983); and Board of Trustees, et al. v. Miss. Publishers Corp., 478 So.2d 269 (Miss. 1985), how can we claim we are entitled to secrecy in legislating rules (laws) dealing with practice and evidence?
The members of this Court have now embarked upon a course of having its members engage in public debate. What an apotheosis for the Supreme Court of this State.
Think of the mass of material we are legislating. Practice and procedure in trial courts fill two volumes of the 1942 and 1972 codes. This Court's legislative enactments, euphemized as "rules," already fill a volume.
If the majority thought the Legislature should have been excluded from enacting, and the Governor from signing into law, statutes and laws on court practice and evidence, then it should have sought an amendment to our Constitution by constitutional processes. It has taken a much shorter, more direct, and dangerous route in amending the Constitution by judicial interpretation. It is legal poppycock, however, and indeed bizarre to assert that our present Constitution remotely grants this Court the authority seized in Hall and Mitchell.
The elasticity the majority has applied in Hall to Article 6, § 144, 539 So.2d 1345-1346, giving short shrift to Article 6, § 146, "Of lesser significance today, Miss. Const. Art. 6, § 146 provides ..." [Emphasis added] 539 So.2d 1345, fn. 15, and totally ignoring Article 4, § 90(s), Article 3, § 31, and Article 6, § 163 of our Constitution discredits this Court.
Nor has this Court in Hall and Mitchell and again today discarded some minor or inconsequential statute. Of tragic dimension is the fact that the majority has struck every sentence, every word of a Legislative enactment in which the people of this State have a deep and profound public interest, the difficult task of combating the odious crime of child sexual abuse. Our children are our most helpless and our most sacred trust. We have taken away from the people any authority to enact such a law *409 through their duly-elected representatives and placed in the hands of non-elected private citizens the responsibility to advise this Court, following which the majority will decide what will and will not be the law.[8]
As a member of this Court, on a case-by-case basis, I am prepared for this Court to interpret and enunciate rules of evidence as required to reach a decision in the particular case. I am not prepared, however, to accept as valid or lawful any purely prospective evidentiary rule of the same effect as a statute predicated on our assertion that only this Court has the Constitutional authority to enact it. No lawful rule can be adopted, in my view, on such an invalid premise. This to me is a rank usurpation, and is a gross insult to the Legislative Branch of our Government.
Yet the majority chooses to tread this wobbly, uncertain and perilous path, and unnecessarily adding to the burden of prosecuting these sexual abuse cases.

THE MISSISSIPPI CHILD ABUSE EVIDENCE ACT MISS. CODE ANN. § 13-1-403, ET SEQ.
A brief history of how this Act came into being is in order.
An excellent analysis of the problem of introduction of hearsay evidence in child sexual abuse cases with some proposed guides are contained in Note, A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases, 83 Colum.L. Rev. 1745 (1983). Two key words emerge from both Rule 803(24) of the Mississippi Rules of Evidence and the article: necessity and trustworthiness. These are requisite ingredients which any circuit judge must find before admitting testimony which fails the other hearsay exceptions.
The above article criticizes the various rationales used by courts in admitting hearsay statements by sexually abused children. The author finds problems with the spontaneous exception in that the recitation by a child of some sexual event may not be spontaneous at all. Id. at 1756. As to the tender years exception, it is criticized for permitting "impermissible bootstrapping." Id. at 1761. The residual exception of Rule 803(24) is criticized as having been created for a number of admittedly heretofore unrecognized situations, and not specifically designed for hearsay statements of sexually abused children. The author concludes by recommending a statutory exception such as enacted by the State of Washington:
A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of the state of Washington if:
(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient idicia of reliability; and
(2) The child either:
(a) Testifies at the proceedings; or
(b) Is unavailable as a witness: Provided, That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party his intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to prepare to meet the statement.
1982 Wash. Legis. Serv., ch. 129, § 2 (West).
The State of South Dakota in 1985 enacted a statutory exception in child abuse *410 cases almost identical to the Washington statute, SDCL 19-16-38. The Supreme Court of South Dakota in Matter of C.L., 397 N.W.2d 81, 84 (S.D. 1986), found the statute "superior in sexual abuse cases to both the spontaneous exclamation exception and the residual exception approach."
It was no doubt in response to this felt need that the office of the Attorney General prepared the draft of this Act and presented to the 1986 Legislative session. By Laws 1986, Ch. 345, effective after July 1, 1986, Miss. Code Ann. § 13-1-401, et seq. (Supp. 1986) our Legislature enacted statutes governing evidence in child abuse cases. The majority has held such a law beyond Legislative "competence." This ignores the fact that the Child Abuse Evidence Act was prepared by the chief law enforcement office of this State. I doubt seriously that this Court will receive any better evidentiary "advice" in such cases than the Legislature received from the office of the Attorney General. Miss. Code Ann. § 13-1-403 of that Act provides:
§ 13-1-403. Admissibility of child's out-of-court statements.
(1) An out-of-court statement made by a child under the age of twelve (12) describing any act of child abuse, sexual abuse or any other offense involving an unlawful sexual act, contact, intrusion or penetration performed in the presence of, with, by or on the declarant child, not otherwise admissible, is admissible in evidence to prove the contents there of, if:
(a) Such statement is made for the purpose of receiving assistance or advice in order to prevent or mitigate the recurrence of the offenses, or in order to obtain advice about the psychological, social or familial consequences associated with the offenses; and
(b) Such statement is made to a person on whom the child should reasonably be able to rely for assistance, counseling or advice; and
(c) The child either:
(i) Is available to testify; or
(ii) Is unavailable as a witness, provided that there is other corroborative evidence of the abuse or offense. A finding of unavailability, except in those situations specified by Rule 804 of the Mississippi Rules of Evidence, shall require a finding by the court, based on the specific behavioral indicators described in § 13-1-411, that the child's participation in the trial would result in a substantial likelihood of traumatic emotional or mental distress; and
(d) The court finds in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient guarantees of trustworthiness. In determining the trustworthiness of the statement, the court may consider the age and maturity of the child, the nature and duration of the abuse or offense alleged, factors which may detract from the declarant's credibility, information provided about the child's reliability based on the specific behavioral indicators described in § 13-1-411, or any other factors deemed appropriate. [Emphasis added]
(2) The defendant shall be notified no later than ten (10) days before trial that an out-of-court statement as described in this section shall be offered in evidence at trial. The notice shall include a written statement of the content of the child's statement, the time the statement was made, the circumstances surrounding the statement which indicate its reliability and such other particulars as necessary to provide full disclosure of the statement.
(3) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this section.
One cannot read this Act without being impressed with the thought and study that went into its preparation. In my view this statute fully satisfies Constitutional guarantees that before hearsay evidence is admitted, a trial judge must be satisfied it is necessary and as trustworthy as in-court testimony would be. In this case the victim testified, and therefore there is no Sixth Amendment problem. Coy v. Iowa, 487 U.S. ___, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).
*411 The majority's claim of Constitutional authority to exclude the Legislative and Executive branches of our State from enacting statutes on trial practice and evidence is bogus. Interestingly, the only possible basis for a claim that this Court is paramount in initiating rules come from statutes enacted by the Legislature relinquishing this authority to this Court, Miss. Code Ann. § 9-3-61, et seq., originally enacted by Laws 1975, ch. 501. As amended by Laws 1982, ch. 321, Miss. Code Ann. § 9-3-71 requires, however, that any proposed rules be submitted to the Legislature for study. And, unless rejected by the Legislature the proposed rules become effective. In Hall we declared these statutes "are, of course, of no force and effect." 539 So.2d 1345, fn. 16.
The flaw in the majority's thinking can be demonstrated by a simple illustration.
I would presume that any ninth grade civics student knows that our system of government is based, not on the innate goodness of man, but rather the somber recognition by our forefathers that men in power, unless checked and restrained, were predisposed to mischief and tyranny. Thus, the genius of our forefathers in devising a Constitution whereby no one branch of the government would be without checks, without balance, from the other two.
John Adams said: "The judicial power ought to be distinct from both the Legislative and Executive and independent of both, that so it may be a check upon both, as both should be checks upon that." [Emphasis added]
The Legislative Branch acts as a check on the Executive Branch by duly enacted statutes delineating the responsibilities and authority of the Executive, and by appropriation of funds with which to carry out its duties. The Executive cannot exceed the limitations imposed upon it by statute.
The Judiciary in turn acts as a check on the Executive when a court action is filed to prohibit the Executive from exceeding its authority, or to compel the Executive to carry out its duties.
The Executive acts as a check on the Legislative Branch by the exercise of veto power.
The Judiciary in turn acts as a check on the Legislative Branch by declaring unconstitutional statutes which violate rights of individuals under the Constitution.
There are thus two checks by separate branches on both the Executive and the Legislative.
When, however, this Court legislates all the methods and manner of court procedure and declares that it, and it alone, has the power to do so, where is the check by either the Legislative or the Executive? There is none. What can the Legislative do? What can the Executive do?
This is frightening.
Under our Constitutional scheme, the Legislature, as tediously set forth in the Hall dissent, manifestly has the lawful authority to enact statutes on procedure and statutes on evidence, and in the absence of their violating the Constitutional right of the litigants, this Court has a Constitutional duty to uphold them. This Court has destroyed this principle.
The majority deludes itself if it thinks Hall, Mitchell, its holding today, and the course it charts for this Court is not staggering in negative potential. Can it believe that the Legislature will not eventually realize what this Court has done? Can it believe that even if, somehow, the present membership of the Legislature overlooks our trespasses (which I do not for a moment think will happen), that the people will tolerate a Legislature that permits the power of the people to be thus emasculated?
High-sounding language from the majority may continue in its eloquent flow. From time to time there will no doubt be melodious protests of innocence from the majority. This cannot obscure an absolute fact: A priceless right vouchsafed by our Constitution has been taken from our people, the power to enact, through their Legislature, laws pertaining to trial court practice. If this Court can nullify an act of such profound importance to the people of this *412 State as the Child Abuse Evidence Act as beyond Legislative "competence" to enact, it can nullify any statute on practice and evidence at will.
NOTES
[1] THIS DAY this cause came on for Initial Appearance, and the court, having been duly advised in the premises, FINDS that the Defendant in the above styled and numbered Cause, appeared in Court represented by Honorable Jefferson B. Stewart, Attorney of Record ..., that said Defendant was charged with Capital Rape and the Defendant was advised in Open Court;
1. That the Defendant is not required to speak and that any statements he makes may be used against him.
2. That the Defendant is unrepresented, that he has the right of counsel, and that if he is unable to afford counsel, an attorney will be appointed to represent him.
3. That the defendant has the right to communicate with counsel, family, or friends and that reasonable means will be provided to enable him to do so.
4. That the Defendant has the right to a preliminary hearing and further, the Defendant was furnished a copy of the charges against him and a preliminary hearing (was) ... waived, and that said Defendant requested that bond be set.
IT IS, THEREFORE, ORDERED AND ADJUDGED that the defendant on this day appeared in Open Court charged with Capital Rape and that the Defendant be, and is hereby, remanded to the custody of the Sheriff of Forrest County, Mississippi, to await action of the Grand Jury (with bond) ... upon said charge in the amount of $200.000.00.
SO ORDERED AND ADJUDGED on this the 3rd day of May A.D. 1985.
[2] The Mississippi Rules of Evidence apply to criminal as well as civil cases. Rule 1101, and comment under Rule 101.
[1] P. 115, fn. 18.
[2] P. 116.
[3] P. 124, fn. 53.
[4] P. 131.
[5] P. 156.
[6] P. 115, fn. 18.
[7] P. 115, fn. 18.
[8] I do not for one moment denigrate the dedicated service rendered by the Advisory Committee on Rules, composed of distinguished lawyers and judges. They are all patriotic Mississippians, and among our highest caliber citizens. The point, as they would be the first to acknowledge, is that they were not elected by the people of this State to enact rules. They are an advisory group to this Court. And, it is an unfair imposition upon them, in my view, to ask them to be accessories to this Court's usurpation of power, by asking them to furnish us with proposed rules after we have excluded the Legislature.