THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDMOND WILLIAMS, Defendant-Appellant.
First District (1st Division) No. 1—89—0609

Opinion filed September 30, 1991.

Randolph N. Stone, Public Defender, of Chicago (Kathleen M. Pantle and John T. Kennedy, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Daniel Rabinovitz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant, Edmond Williams, was arrested on November 13, 1987, and charged by indictment with aggravated kidnapping, aggravated criminal sexual assault and attempted murder. Following a jury trial, defendant was found guilty of attempted murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—4) and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)) and acquitted of the aggravated criminal sexual assault charge. Finding that the crime of attempted murder was accompanied by exceptionally brutal and heinous behavior, the trial court determined that defendant was eligible for an extended-term sentence and sentenced him to consecutive terms of 60 years' and 15 years' imprisonment for attempted murder and aggravated kidnapping, respectively.

On appeal, defendant contends: (1) that section 115—7.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—7.1), which prohibits a court from ordering a sex victim to submit to a psychiatric or psychological examination, is unconstitutional on the ground that it violates the doctrine of separation of powers and equal protection; (2) that the trial court erred in denying his motion for a mistrial when the victim's surprise testimony revealed statements allegedly made by the defendant that were not previously disclosed to the defense pursuant to Supreme Court Rule 412 (134 Ill. 2d R. 412); (3) that the State's introduction into evidence of a photo-

graph of a disassembled rifle, that was found at the scene of the crime but not used in the commission of the crime, prejudiced his right to a fair trial; (4) that prejudicial error resulted when a State witness commented about defendant's alleged gang affiliation; and (5) that the trial court abused its discretion in imposing an extended-term sentence.

The evidence adduced at trial reveals that on November 13, 1987, at approximately 3 a.m., the complainant, R.J., left a dance club, and as she waited for a bus in the vicinity of Clark and Belmont, she was approached by defendant, who drove up in a jeep, pointed a gun in her face, and threatened to kill her if she did not enter the jeep. Defendant drove her around the northside of Chicago for about an hour before he parked the jeep, forced R.J. to lie flat on the floor in the back of the jeep and told her to pull down her pants. Defendant told R.J. that his name was "Ed," that he was on a "mission from God," that she would be his "sex slave" and that if she failed to cooperate, he'd "hit her in the head with this hammer."

R.J. testified that after defendant raped her, he taped her hands together with transparent tape and made her kneel in the back of the jeep. While he drove around for another 45 minutes, defendant threatened to throw R.J. over a bridge and "to throw (her) in the river." Defendant then stopped somewhere on the southside of Chicago where he forced R.J. at gunpoint inside an apartment building, made her lie on a mattress, tied her to a board and, for the second time, raped her. R.J. testified that afterwards, defendant stated that he would have to take her downstairs "to see Mr. C. so he can know what to do with me." Defendant then directed R.J. down a set of stairs leading from the apartment to the outside of the building and brought her to the basement of the building next door to the apartment. When defendant unlocked the doors to the basement, he told R.J. "that he was going to have to kill her now" and pointed the gun at her. As R.J. began to run toward the entrance of the building, she heard two shots; one bullet entered her back and she fell to the ground. While she lay on the ground, R.J. saw defendant get in the jeep and leave.

R.J. further testified that defendant wore a brown rawhide jacket, plaid shirt, navy blue Adidas jogging pants and gym shoes. She got a good look at defendant's face during the sexual assault in the apartment building and positively identified him from an array of photographs shown her at the hospital. On cross-examination, R.J. stated that she saw two guns during the crime: a black assault rifle which defendant used throughout the crime and a brown rifle which she saw

in the apartment where defendant raped her. R.J. testified that at the time she did not think to tell the police about the second gun and she did not tell them that defendant said he was going to throw her in the river.

Officer John Valachovic testified at trial that upon arriving at the scene, he observed R.J. lying in the gangway and when he approached her, she repeated several times that "Ed shot me." R.J. was taken to Jackson Park Hospital, where she underwent emergency surgery for several hours. The surgeon, Dr. Frank Apantaku, testified that the bullet passed through R.J.'s back and abdominal area, causing her to be paralyzed from the waist down. He further stated that immediately after surgery, R.J. seemed to be alert and coherent and that she seemed to understand what had happened to her. However, two or three days after the surgery, R.J. began to show signs of post-traumatic stress syndrome. He explained that post-traumatic stress syndrome sometimes occurs when a patient "who has been through some harrowing experiences would tend to react inappropriately sometimes to something that you and I may not consider threatening."

Detective Patrick Sullivan testified that earlier in the day, when he first spoke with R.J., she gave him a physical description of her attacker and told him that she had been shot by "Ed." Later that evening at about 6 p.m. he went to the hospital and showed R.J. a photobook with about eight photographs of men. Although R.J. was unable to speak because of a breathing monitor that was in her throat, she was able to nod her head "yes" or "no." When shown a picture of defendant, R.J. "reacted violently" and indicated positively that this was the person who had attacked her.

Sullivan stated that while at the hospital Officer Buckles gave him a set of keys that she found outside the apartment building. When Detective Sullivan went to the crime scene, he entered the second-floor apartment where he found transparent tape, some cord and photographs on the night stand. Sullivan also found a large padlock lying on the ground near the basement apartment and the keys that Officer Buckles had given him opened that lock. In an abandoned, burned-out apartment next to defendant's apartment, about 10 feet down a common hallway, Sullivan recovered a loaded, cocked machine gun and a rifle. Over defendant's objections, photographs of the weapons were admitted into evidence. The evidence also shows that on the night of November 13, while driving a blue Chevy Blazer with silver stripes, defendant was arrested near 46th Street and King Drive and taken to

the police station, where he was read his *Miranda* rights and questioned by the police and assistant State's Attorney.

In his defense, defendant called technician Jim Sanders, who testified that although he dusted the crime scene, he did not find a single fingerprint. On cross-examination, however, Sanders explained that it is very difficult to lift a fingerprint when a crime scene is very dusty. He stated: "They (the apartments) were dirty and dusty, which makes getting a print almost impossible." Defendant then rested, and following convictions for attempted murder and aggravated kidnapping, he was found eligible for an extended term by the trial court and given consecutive sentences of 60 and 15 years, respectively.

Defendant first asserts that the trial court erred in denying his pretrial motion for a court-ordered psychiatric examination of R.J. and in refusing to declare section 115—7.1 unconstitutional. He asserts that the statute violates the separation of powers doctrine because the legislature has encroached upon the judicial powers of the court (*People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602) since the propriety of mental and physical examinations of parties and victims historically has been the subject of the rulemaking authority of the court. (*People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 139 N.E.2d 780; *People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367.) Defendant also asserts that section 115—7.1 offends equal protection rights because it unreasonably classifies all defendants charged with sex offenses as enjoying less protection than defendants charged with other crimes and that here it infringed upon his right to confront witnesses and to present a defense where he was prevented from an effective cross-examination of R.J. when the trial court denied his request that she undergo a psychiatric examination.

■ We do not believe that section 115—7.1 offends the separation of powers clauses of the United States Constitution or our Illinois Constitution. The section provides:

> "Court may not order mental examination of sex victim. Except where explicitly authorized by this Code or by the Rules of the Supreme Court of Illinois, no court may require or order a witness who is the victim of an alleged sex offense to submit to or undergo either a psychiatric or psychological examination." (Ill. Rev. Stat. 1985, ch. 38, par. 115—7.1.)

Although this section bars a trial court from ordering a rape victim to submit to a psychiatric examination (see *People v. Jameson* (1987), 155 Ill. App. 3d 650, 660, 508 N.E.2d 267) or psychological examination, the paragraph is not an improper legislative invasion upon the judiciary's authority. It is well established that "the legislature of a

State has the power to prescribe new and alter existing rules of evidence or to prescribe methods of proof." *People v. Wells* (1942), 380 Ill. 347, 354, 44 N.E.2d 32; *People v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, 140, 461 N.E.2d 410.

As the State argues, the section, by its own terms, provides that the court prohibition must yield "where explicitly authorized by this Code or by the Rules of the Supreme Court of Illinois." Thus, the statute neither encroaches on the judiciary's power nor conflicts with any Illinois Supreme Court rule where it provides that if the supreme court were to adopt its own rule on this subject, the legislative mandate to prohibit examinations of complaining witnesses in sex offense cases would yield to the rule. In *Glover*, the Illinois Supreme Court held that a court has the power to order a psychiatric examination of a complaining witness in a sex offense case. However, *Glover* was decided well before the promulgation of section 115—7.1.

■ Defendant's equal protection argument also fails; section 115—7.1 neither creates a suspect classification nor infringes on any fundamental right. In *People v. Requena* (1982), 105 Ill. App. 3d 831, 435 N.E.2d 125, we held that a defendant in a sex case is not within a suspect classification. As this statute greatly resembles the "rape shield law" (Ill. Rev. Stat. 1985, ch. 38, par. 115—7), which governs the admissibility of the victim's prior sexual activity or reputation, it can be said to accomplish a legitimate governmental objective. The constitutionality of the rape shield law has been upheld on the grounds that the statute was designed to encourage victims to report sexual assaults and to eliminate the cruel and abusive treatment of the victim at trial. See *Requena*, 105 Ill. App. 3d 831, 435 N.E.2d 125.

■ Additionally, we find that defendant here was not denied his right to effective cross-examination in violation of the confrontation clause because defendant had the opportunity for effective cross-examination. (See *United States v. Owens* (1987), 484 U.S. 554, 559, 98 L. Ed. 2d 951, 957, 108 S. Ct. 838, 842 (where the Supreme Court found that "the confrontation clause guarantees only an *opportunity* for effective cross-examination." (Emphasis in original)).) In the present case, defendant cross-examined both Dr. Apantaku and R.J. as to her physical and mental state following surgery at the time R.J. identified defendant as her assailant. Defendant also questioned Dr. Apantaku about post-traumatic stress syndrome.

Moreover, defendant could have called as witnesses other hospital employees to testify about R.J.'s mental state. Defendant was prohibited from ordering R.J. to submit to a psychiatric examination; how-

ever, the record does not sustain defendant's allegations that he was denied the right to present a defense regarding R.J.'s ability to identify her attacker or that he was denied a right to confront witnesses where the complaining witness and attending physician-surgeon were both present in court and available for cross-examination.

Accordingly, as it is well settled that "the legislature of a State has the power to prescribe new and alter existing rules of evidence or to prescribe methods of proof" (*People v. Rolfingsmeyer*, 101 Ill. 2d at 140), and since section 115—7.1 specifically authorizes an exception to its own mandate with respect to the judiciary's authority to order an examination, and moreover because defendant's equal protection and confrontation arguments are without merit, we conclude that section 115—7.1 survives defendant's constitutional challenges here.

Defendant next argues that the trial court erred in denying his motion for mistrial where the State failed to disclose during discovery R.J.'s statements made at trial that defendant allegedly told her: (1) that his wife had taken his children away from him; (2) that he would hit her in the head with a hammer; (3) that he was at the river and was going to throw her in the river; (4) that he was at a bridge and was going to throw her over the bridge; and (5) that he would have to take her downstairs to see "Mr. C."

Illinois Supreme Court Rule 412 (134 Ill. 2d R. 412) governs the scope of the State's obligation to disclose material and information to an accused. With respect to statements of an accused, Supreme Court Rule 412 provides that the State shall disclose to defense counsel

"any written or recorded statements and the substance of oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." (134 Ill. 2d R. 412.)

The purpose of the rule is to protect the defendant from surprise and inadequate preparation at trial by allowing defense counsel to investigate the circumstances surrounding any statements. (*People v. Davis* (1984), 130 Ill. App. 3d 41, 49, 473 N.E.2d 387.) In *People v. Orr* (1986), 149 Ill. App. 3d 348, 500 N.E.2d 665, where the defendant was charged with aggravated arson and arson, we found that defendant was prejudiced by the State's nondisclosure of defendant's alleged statement made five days before the incident wherein he told the daughter of the victim that he "was gonna destroy everything that [she] loved and he was gonna burn [her] mother's house." We determined that the nondisclosed statement constituted a direct threat to commit the crime for which defendant was tried and convicted and that disclosure of the statement would have afforded the defendant an

opportunity to interview the daughter and to formulate a method to discredit or explain her testimony.

■ It is established that the State has a duty to disclose the substance of all statements made by a defendant, even if the statements were not reduced to writing. (*People v. Siefke* (1990), 195 Ill. App. 3d 135, 551 N.E.2d 1361.) In the present case, although some of the statements involved direct threats to commit the crime charged (like in *Orr*), the statements were made during the commission of the offense and were only a few of several statements that defendant made to R.J. Moreover, we believe that the State complied with discovery when it specified R.J. as a potential witness in its answer to defendant's request for discovery and disclosed that the substance of any statements made by defendant were contained in the transcriptions of the preliminary hearing and grand jury proceedings. The record reveals that Detective Sullivan testified before the grand jury that he investigated the incident in question and that he spoke with R.J. He also testified that R.J. related to him how an individual kidnapped her from the streets, raped her and told her "he decided it was a time for her to die" on more than one occasion during the incident. Thus, because these statements were made during the commission of the offense, the substance of which either was contained in the police reports, the grand jury testimony, or could have been discovered by the defense in a pretrial examination of R.J. (*People v. Miller* (1989), 190 Ill. App. 3d 981, 548 N.E.2d 1), we believe that defendant had notice that R.J. intended to testify at trial about the defendant's statements of intent to kill her. Accordingly, we find that the State did comply with Supreme Court Rule 412.

Further, the State contends that the People had no notice of certain specific statements, as those specific statements were not contained in the investigators' reports and R.J. conceded on cross-examination that she did not tell the police that defendant made any remarks about his wife, that defendant told her to kneel behind him or that defendant threatened to throw her in the river. Even if we were to hold that the State did have notice of these complained-of statements, defendant was not prejudiced and is not entitled to a new trial. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) The error, if any, is considered harmless and does not warrant reversal in this case. *People v. Siefke*, 195 Ill. App. 3d 135, 551 N.E.2d 1361.

Next, defendant maintains that the trial court erred in allowing the State to introduce evidence concerning a second rifle, which was disassembled into rifle stock and rifle barrel, but was neither used in the incident nor found in defendant's possession at the time of his ar-

rest. Defendant contends that the introduction of this evidence was reversible error because the State failed to show a clear connection between defendant and the weapon. (*People v. Kincy* (1982), 106 Ill. App. 3d 250, 435 N.E.2d 831; *People v. Jackson* (1990), 195 Ill. App. 3d 104, 551 N.E.2d 1025.) Further, he asserts that introduction of the rifle was highly prejudicial.

■ In the present case, the trial court allowed into evidence the photograph of a rifle that was found in the apartment during the police investigation of the incident. However, there was no evidence presented at trial that this particular rifle was used in the commission of the offense. It is well established that a weapon found in a defendant's possession when arrested, or presumably at the scene of the offense, may be admitted where the weapon bears a connection with the charged offense. (See *People v. Jackson*, 195 Ill. App. 3d 104, 551 N.E.2d 1025.) Thus, it is possible that the photograph of the gun here was either admissible as a detail of the investigation or as a weapon owned by the defendant and suitable for commission of the crime. (*People v. Kincy*, 106 Ill. App. 3d at 258.) Moreover, any mention of the gun here was first raised by the defendant on cross-examination of R.J. R.J. testified that she saw the rifle in defendant's apartment during the commission of the crime. Further, on direct examination, R.J. described a black assault rifle as the gun which was used throughout the offense and the "other" gun, the brown rifle which is the subject here, was mentioned for the first time during defense counsel's cross-examination of R.J. when R.J. was asked "did you see more than one gun?" The determination of whether evidence is admissible with regard to relevancy is within the trial court's discretion, and its decision will not be reversed if the record indicates a sufficient basis for the decision. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696.

Even if the second gun was not connected to the defendant, and its admission was error, the error is considered harmless in light of the overwhelming evidence of defendant's guilt. It has been held that a trial error will be deemed harmless where the evidence supporting the defendant's conviction would result even if the error were eliminated. *Jackson*, 195 Ill. App. 3d at 114, citing *People v. Grant* (1979), 69 Ill. App. 3d 940, 944, 387 N.E.2d 1087.

Defendant next urges that he was prejudiced when the trial court allowed a State witness to testify that defendant allegedly belonged to a gang. Prior to trial, the court reserved ruling on defendant's motion *in limine* to preclude the prosecution from introducing evidence of alleged gang affiliation. However, during the State's case, Officer Koos-

tra responded to a question about his investigation of the incident and testified as follows:

"I continued with my investigation in the—up and down areas, alleys, gangways, for any—for a subject that was a janitor of that courtway building. His name was Edmond Williams, also known to me as Amad, an El Rukn general."

The trial court sustained defendant's objection and instructed the jury to disregard "the last comments of the witness" and further stated "I'm striking that—the end of his answer to that question." Defendant claims that the trial court erred in not granting a mistrial or a new trial because the reference to gang affiliation was prejudicial to him. (*People v. Parrott* (1976), 40 Ill. App. 3d 328, 352 N.E.2d 299.) Defendant maintains that unlike the case of *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, there are no facts here to suggest that gang membership showed common design and purpose to do an unlawful act to which all assent or any relevance to the crimes charged.

■ The State counters that *Parrott*, which defendant claims stands for the proposition that there is widespread prejudice against street gangs in America, does not, however, stand for the proposition that improper testimony that a defendant was a member of a gang is always prejudicial. In fact, many courts have found that references to a defendant's gang affiliation is harmless error. (See, *e.g., People v. Portis* (1986), 147 Ill. App. 3d 917, 498 N.E.2d 675; *People v. Carter* (1985), 132 Ill. App. 3d 523, 447 N.E.2d 1307.) We agree. First, the State did not elicit the testimony of the officer about defendant's alleged gang affiliation. Second, like in the *Carter* case, the reference here was minor and "did not result in an inflammation of the jury here so as to sway [it] from a rational evaluation of the facts in issue." *Carter*, 132 Ill. App. 3d at 529.

Furthermore, the error, if any, was cured by the trial court's admonishment to the jury. The court stated:

"THE COURT: *** [B]efore we continue, I wish to call to your attention that the previous answer of the witness was stricken with regard to the reference to the El Rukns. There was no evidence that Mr. Williams is an El Rukn, and you should disregard any reference of the witness to the El Rukns. That means that you should not in any way consider that statement when you are deliberating upon your verdict. That is stricken from the record, and you should not consider it. Your oath as a juror requires that."

Neither would the comment change the result of the verdict since the other evidence was overwhelming that defendant was guilty of aggravated kidnapping and attempted murder.

Finally, defendant argues that the trial court improperly considered the offense of aggravated criminal sexual assault, specifically the factors that R.J. was brutally attacked and abused, when it imposed an extended-term sentence. The State responds that when the trial court used the words "abused" and "attacked" it was referring to the numerous instances of verbal abuse and physical attacks upon R.J. other than those associated with the aggravated criminal sexual assault charge. Further, because defendant's sentence here would not have been different had the sentencing court considered an improper factor, the State asks this court to affirm defendant's sentence of 60 years for attempted murder.

Section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)) authorizes a judge to impose a term of imprisonment in "excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted" where the factors set forth in paragraph (b) of section 5—5—3.2 are found to be present. Section 5—5—3.2 provides, in relevant part:

> "[T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender ***:
> ***
>
> (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

■ In the present case, the trial court considered defendant's past criminal record and the circumstances and facts surrounding this particular incident. The trial judge found that defendant took the victim off the streets at gunpoint, transported her about the city, threatened her, tied her up, blindfolded her and in other ways and other manners, attacked her. He determined that R.J. was taken to another site, abused again and then taken to a basement and shot by the defendant when she attempted to flee. The court considered that the results of the gunshot caused a severed spinal cord and rendered R.J. a paraplegic and confined to a wheelchair for life. The court also determined that defendant's conduct required a sentence to protect the public from further criminal conduct on his part.

The reviewing court uses an abuse of discretion standard to determine whether the trial court properly found defendant eligible for an extended-term sentence under the Unified Code of Corrections based on the brutal or heinous nature of the most serious of the offenses of which defendant was convicted. (*People v. Andrews* (1989), 132 Ill. 2d 451, 464, 548 N.E.2d 1025.) In applying this standard and based upon a review of the facts in this case, we find no abuse of discretion by the trial court in imposing an extended-term sentence upon defendant. R.J. stated at trial that defendant raped her on two occasions during this time and threatened her several times. Even though defendant was found not guilty by the jury on the charge of aggravated criminal sexual assault and the trial court may have improperly considered the facts attendant to this charge, we believe that the extended-term sentence was otherwise warranted in light of defendant's criminal background and the trial court's finding of the presence of other aggravating factors. Reliance on an improper factor in aggravation does not always necessitate remandment for resentencing. (*People v. Fields* (1990), 198 Ill. App. 3d 438, 441, 555 N.E.2d 1136.) The defendant used a military-type weapon and should have known that the subsequent aiming and firing of this type of rifle would naturally and probably result in serious injury or death to R.J. We believe the facts show that defendant acted with exceptionally brutal and heinous behavior indicative of wanton cruelty where he abducted R.J. and kept her bound and taped for several hours while he continually threatened and terrorized her. Accordingly, defendant's extended-term sentence is affirmed.

Defendant's convictions for attempted murder and aggravated kidnapping are affirmed, and his extended-term sentence of 60 years' imprisonment for attempted murder and consecutive term sentence of 15 years' imprisonment for aggravated kidnapping are affirmed.

Affirmed.

BUCKLEY and O'CONNOR, JJ., concur.