THOMAS ABBOTT, aka THOMAS EDWARD ABBOTT,
Appellant, v. THE STATE OF NEVADA, Respondent.

No. 44275

July 13, 2006

138 P.3d 462

*Keith C. Brower* and *Gregory L. Denue*, Las Vegas, for
Appellant.

*George Chanos*, Attorney General, Carson City; *David J.
Roger*, District Attorney, and *Bill A. Berrett* and *James Tufteland*,
Chief Deputy District Attorneys, Clark County, for Respondent.

# OPINION

By the Court, ROSE, C. J.:

Thomas Abbott was charged with two counts of lewdness with a minor under the age of fourteen, for allegedly fondling his girlfriend's nine-year-old daughter's vagina. Following a jury trial, Abbott was convicted of both counts and sentenced to two concurrent life sentences, with parole eligibility after ten years. The victim had previously made allegedly false allegations against Abbott, as well as against her father and schoolmates. The victim had also

engaged in sexual behavior since she was four years old. Based on this, Abbott attempted to introduce evidence of the prior false allegations and asked the district court for an independent psychological evaluation. The district court denied both requests. Abbott challenges those decisions on appeal.[1]

Because of the nature of Abbott's claims, we have occasion to address three of our previous decisions in sexual assault cases to examine whether these decisions properly strike the delicate balance between a criminal defendant's fair trial rights and a victim-witness's privacy. First, in *State v. District Court (Romano)*,[2] we announced a revised and more restrictive standard than had previously existed under *Koerschner v. State*[3] for when the district court may order an independent psychological evaluation of a victim. We conclude that *Romano* impermissibly restricts a defendant's access to an independent psychological examination of an alleged victim-witness, and we overrule *Romano* and reinstate the test set forth in *Koerschner*.

Second, in *Chapman v. State*,[4] we stated that the clinical forensic interviewer who interviews the victim is not an expert for the purposes of *Koerschner*. We conclude that *Chapman* incorrectly announced a blanket rule, and we clarify *Chapman*'s holding. When the clinical forensic interviewer analyzes, and not merely recites, the facts of the interview, and/or states whether there was evidence that the victim was coached or was biased against the defendant, the clinical forensic interviewer will be deemed an expert witness for purposes of applying the *Koerschner* rule. Applying the above principles to the instant case, we conclude that Abbott was entitled to an independent psychological examination of the victim.

Third, the test for whether prior false allegations of sexual assault may be introduced is set forth in *Miller v. State*.[5] We conclude that the *Miller* standard is appropriate, and we decline to alter it. However, we conclude that, in the instant case, the district court abused its discretion by excluding evidence of prior false allegations. We conclude that the above errors require reversal of Abbott's conviction and remand for a new trial.

---

[1]Abbott also challenges the district court's denial of a mistrial based on improper testimony and argues that the two convictions for lewdness violate his right to be free from double jeopardy. We conclude that Abbott's argument lacks merit, and our decision reversing Abbott's conviction renders moot his argument regarding double jeopardy.

[2]120 Nev. 613, 97 P.3d 594 (2004).

[3]116 Nev. 1111, 13 P.3d 451 (2000), *modified by Romano*, 120 Nev. 613, 97 P.3d 594.

[4]117 Nev. 1, 16 P.3d 432 (2001).

[5]105 Nev. 497, 779 P.2d 87 (1989).

## FACTS

Abbott and his girlfriend, Tracy, met while working together in Las Vegas, Nevada. When Abbott and Tracy began dating, Tracy was in the process of a bitter divorce from her then-husband David. Tracy and David had two daughters, the nine-year-old victim in this case and the victim's younger sister. Tracy's divorce was finalized one year after she and Abbott began dating, and subsequently, Tracy relocated with her two daughters to Colorado. Abbott remained in Las Vegas to care for his ailing father and maintained a long-distance relationship with Tracy. He visited Tracy in Colorado periodically and would stay with her and her daughters in their home. Two years after moving to Colorado, Tracy and her daughters moved back to Las Vegas. Tracy and Abbott continued their relationship, and although Abbott maintained a separate residence, he often stayed at Tracy's home for weeks at a time. Tracy and Abbott's relationship lasted for approximately four years and ended after the events giving rise to this case.

### The incident

The incident at issue occurred after Tracy and her daughters moved back to Las Vegas. On the day of the incident, Tracy took the victim and her sister to their grandmother's home. The victim used her grandmother's computer to look up her and her sister's names on the Internet to see what website would appear. The victim's name returned a realtor's website, while her sister's name returned a pornographic website. The victim told Tracy about the website, saying that she saw pictures of naked girls and that she saw a picture of a girl who had breasts and a penis. Later that evening, Abbott arrived at Tracy's home, and Tracy told Abbott what the victim had seen on the computer screen.

Tracy was ill and went to bed early that night. The victim and her sister each had her own room, and when Tracy went to bed, the victim was in her own bedroom reading a book. Abbott, who was spending the night at Tracy's house, was taking a shower in Tracy's master bedroom. At this point, the recounting of events differs.

### The victim's and Tracy's version of events

The victim testified that Abbott entered her room, sat down on her bed, and touched her vagina with his fingers. Abbott then got up briefly and went to the victim's bedroom door to see if Tracy was awake. Abbott returned to the victim's bed, lay down next to her, and touched her vagina again. The victim ran into Tracy's room, woke her up, and told her that Abbott was touching her privates. Tracy confronted Abbott, in front of the victim, about the

victim's allegations. Abbott denied the allegations, cried, and repeatedly said that they were not true and that he did not touch the victim. Tracy told Abbott that he had to leave the house and the victim said, "No mommy, I don't want him to go. I just want him to stop." Abbott left, and Tracy telephoned her ex-husband David, who came to the house.

A few days after the incident, Tracy and David took the victim to meet with a detective from the Las Vegas Metropolitan Police Department's (LVMPD) sexual abuse detail, William Ettinger. The victim was also given a physical examination. Detective Ettinger testified at trial at some length about his education and training in the field of sexual crimes against children. He stated that when he interviewed the victim, he used various techniques he had learned during trainings on how to interview child victims in sex assault cases. He testified that the techniques he used demonstrated that the victim knew the difference between a truth and lie, that she promised not to lie, and that he found no evidence that the allegations were either coached or fabricated. The physical examination was normal and revealed no evidence of sexual assault. The State then charged Abbott with two counts of lewdness with a minor under the age of fourteen.[6]

### Abbott's version

Abbott testified that he was doing laundry and passed by the victim's bedroom door. The victim asked him to come into her room and read with her, and Abbott told her that he would, but he first needed to take his laundry downstairs. Abbott started his laundry and then went back to the victim's room to read. While reading, Abbott heard a thumping noise below them and realized that it was the washer. He left the victim's room and went downstairs to fix the thumping. After he fixed the washing machine, he smoked a cigarette in the garage. After approximately five to fifteen minutes he went back upstairs and looked in the victim's room, thinking she would still be reading. Instead, she was sleeping, and Abbott pulled the book out from under her head and turned out her light. She awoke and asked him for her bunny and her blanket, and he handed them to her and left the room. Abbott went back downstairs to finish the laundry.

Abbott then went back upstairs, and when he was at the top of the stairs, he saw the victim walking toward her mother's room. He believed that she was sleepwalking as she had done in the past. The victim walked to her mother's bedroom door, looked in, waved her

---

[6]The victim also stated that Abbott forced her to touch his penis. However, the justice court found that there was insufficient evidence to bind this charge over for trial, and therefore, it was dismissed prior to trial.

hand like "never mind," and then walked past Abbott. Abbott asked her what she was doing, and she said that she was going to tell her mother good night. The victim walked back into her mother's room, and Abbott went back downstairs to the laundry room. He then heard Tracy call his name and ask him to come upstairs, which he did. Tracy confronted Abbott and asked him to leave. Abbott told Tracy to call David and ask him to come to the house. Abbott then left Tracy's house but called later that evening and spoke with both Tracy and David.

### Prior false allegations/prior sexual behavior and exposure

The victim had previously made allegations of sexual assault against David, schoolmates, and Abbott. Against David, the victim told a friend that David "touched her 'privates' and it felt good." The friend's mother called Tracy to let her know. When Tracy questioned the victim about this, the victim first denied making the statement but then told her mother that David did touch her. Tracy asked the victim to show her how David touched her and the victim rubbed Tracy's back. Tracy then asked the victim if it was true that David had touched her privates, and the victim said no.

Regarding schoolmates, the victim claimed that a boy at school grabbed her buttocks. There were no witnesses, and when the boy was questioned he denied the story "to the point of tears." The victim also accused a boy when she was three or four years old of touching her on the buttocks in the bathroom at daycare. Daycare personnel told Tracy and David that this was not possible because the children are not allowed to go into the bathroom together, and a teacher stands at the door while the child is in the bathroom. Tracy and David dismissed the victim's report as an exaggeration.

Against Abbott, when the victim was living in Colorado, she told Tracy that Abbott had sex with her while he was visiting them. Tracy had gone to the grocery store, and Abbott and the victim remained at the house. The victim said that Abbott pulled her pants down and had sex with her. Tracy took the victim to see a counselor, and Tracy also took her for a physical examination, which proved normal.

The Lakewood Police Department investigated these allegations. Throughout the investigation, Tracy and David maintained that they did not believe the allegations and did not think that this event had occurred because of the victim's prior false accusations. Both Tracy and David noted that their bitter divorce could have been the cause of the allegations. During the investigation, the victim often recanted her story, saying that it was a dream and that she made it up for attention. The Lakewood Police Department closed the case, declining prosecution because it was "not winnable."

Regarding other sexual behavior and experiences, the victim had previously inserted various items, including Styrofoam balls and multiple erasers into her vagina. The victim once pole danced on Tracy's four-poster bed following a visit with David and his adult-dancer girlfriend Francesca. The victim had also seen her father and Francesca showering together and had talked with her mother about why the victim could not be in the bathroom with Abbott when he showered and about why Tracy and Abbott did not shower together too. On another occasion, David noticed that the victim was fidgeting and that her vagina was very red, and he thought that her hymen was gone. The victim claimed that a playmate was putting his fingers in the area, and David had her examined. The medical examination was normal. Finally, the victim was also caught watching a pornographic movie showing a male and female having sex.

Based on the above, Abbott asked for an independent psychological examination of the victim and also asked to have the above evidence admitted. The State moved for admission of the Colorado allegation against Abbott as a prior bad act. The district court denied the parties' requests, ordering that the prior false allegations were inadmissible because they would confuse the jury. The district court also ordered that no evidence regarding the victim's prior sexual conduct, experiences, and behavior would be admissible.

Following a jury trial, Abbott was convicted of both counts of lewdness with a minor under the age of fourteen. He received two concurrent life sentences with the possibility of parole after ten years. Abbott appeals his conviction, arguing that the district court abused its discretion by refusing his request for an independent psychological examination and refusing to admit evidence of prior false allegations.

## DISCUSSION

*Independent psychological examination—State v. District Court (Romano)[7] and Koerschner v. State[8]*

Abbott argues that the district court abused its discretion by denying his request for an independent psychological examination of the victim. Abbott contends that, based on the victim's prior false allegations and sexual behavior and experiences, he has demonstrated a compelling need for an independent psychological examination. The State argues that under *Romano*, because the State did not call or benefit from an expert witness, Abbott was not entitled to an examination.

---

[7]120 Nev. 613, 97 P.3d 594.

[8]116 Nev. 1111, 13 P.3d 451.

"The decision to grant or deny a defendant's request for a psychological examination of a child-victim is within the sound discretion of the district court and will not be set aside absent an abuse of discretion."[9] In exercising its discretion, " '[t]he district court should base its decision on the facts and circumstances of each case.' "[10] At the time of Abbott's trial, *Koerschner* governed when courts can compel an independent psychological evaluation of a child victim in a sexual assault case. However, in September 2004 this court announced a revised, more restrictive rule in *Romano*.[11]

Under *Romano*, "a defendant is entitled to a psychological examination of an alleged sexual assault victim only where: (1) the State notices the defendant that it intends to examine the victim by its own expert and (2) the defendant makes a prima facie showing of a compelling need for a psychological examination."[12] To determine whether a compelling need exists, the district court "must consider: (1) whether little or no corroboration of the offense exists beyond the victim's testimony, and (2) whether there is a reasonable basis 'for believing that the victim's mental or emotional state may have affected his or her veracity.' "[13]

Finally, even if the above conditions are met, an alleged sexual assault victim is not required to submit to the defendant's psychological evaluation.[14] But, if the victim refuses to submit to the defendant's examination, "the State may not introduce expert evidence, either in a report or testimony that addresses or assesses the victim's character."[15] Thus, both the State and the defendant are then restricted to using generalized testimony submitted by experts who have not personally examined the victim.[16]

Prior to *Romano*, the test set forth in *Koerschner* was used to decide when the district court should allow an independent psychological examination of a victim in a child sexual assault case.

---

[9]*Chapman v. State*, 117 Nev. 1, 4, 16 P.3d 432, 434 (2001).

[10]*Id.* (quoting *Keeney v. State*, 109 Nev. 220, 226, 850 P.2d 311, 315 (1993), *overruled in part by Koerschner*, 116 Nev. 1111, 13 P.3d 451 (alteration in original)).

[11]We consider *Romano* because Abbott's appeal was not final at the time of its decision. *See Richmond v. State*, 118 Nev. 924, 928-29, 59 P.3d 1249, 1252 (2002).

[12]*Romano*, 120 Nev. at 623, 97 P.3d at 600.

[13]*Id.* (quoting *Koerschner*, 116 Nev. at 1117, 13 P.3d at 455).

[14]*Id.* at 623, 97 P.3d at 601.

[15]*Id.*

[16]*Id.*

There are two important differences between *Romano* and *Koerschner*. First, *Romano* and *Koerschner* are drastically different in the way that they weigh the State's use of an expert opinion. Second, until *Romano*, the victim was not permitted to refuse to submit to the defendant's psychological evaluation. Each difference is problematic.

First, under *Koerschner*, whether the State utilizes other tactics, including a psychological expert, is merely a factor to be considered with whether there is little or no corroboration evidence and "whether there is a reasonable basis for believing that the victim's mental or emotional state may have affected his or her veracity."[17] Also, *Koerschner* contemplated that error was committed when a defendant is refused a psychological examination of the victim where the State has the benefit of an expert analysis and the other two factors are satisfied. Finally, there may be instances where the veracity of a child witness may be brought into question because of his or her emotional or mental state and necessitate a psychological examination, even though the State has had no access to or benefit from an expert opinion.[18]

However, under *Romano*, whether the State utilized an expert opinion became the threshold determination for whether a defendant can independently examine the victim. Thus, although a defendant may be able to demonstrate a compelling need, the defendant is not able to independently examine the child unless the State first chooses to have the child examined. As such, *Romano* represents a drastic departure from *Koerschner* and our prior holdings.[19]

Denying the defendant an opportunity to examine the victim could have disastrous consequences, especially in instances where the victim's veracity is seriously called into question and the defendant needs an independent psychological examination to present an adequate defense. The rule in *Romano* allows the State to "have absolute control over whether an examination by the defendant could be obtained. The State's use or non-use of an expert should not constitute a threshold-determining factor in such matters."[20] Although it is necessary to protect the victim's privacy in sexual assault cases, this cannot come at the expense of the defendant's right to a fair trial.

[17]*Koerschner*, 116 Nev. at 1117, 13 P.3d at 455.

[18]*Id.* at 1117 n.4, 13 P.3d at 455 n.4.

[19]"[*Romano*] represents the final step in the elimination of a defendant's opportunity to have a psychological examination of the alleged victim in a child sexual assault case and the end of any appearance of fairness in such criminal proceedings." *State v. Dist. Ct. (Romano)*, 120 Nev. 613, 626-27, 97 P.3d 594, 603 (2004) (ROSE, J., dissenting).

[20]*Id.* at 626, 97 P.3d at 603 (MAUPIN, J., concurring).

The State's argument on appeal is illustrative of this rule's improvidence. The thrust of the State's argument is that because the State did not benefit from an expert witness at trial and, in fact, never called "*any* witnesses that testified about [the victim's] mental state," Abbott was not entitled to the psychological evaluation. The State argues, "Ultimately, just as this Court held in [*Romano*], the fact that in the instant case the State never conducted an examination of [the victim] by a psychological or psychiatric expert was dispositive." Although we are not inferring any impropriety in the instant case, the first prong of *Romano* allows the State to be the ultimate gatekeeper over the strategy and presentation of the defense, which could potentially be abused.

Second, the most critical portion of *Romano* is that although a defendant may demonstrate a compelling need for an examination, the victim is not required to submit to the evaluation. We requested that the parties provide supplemental briefing on whether this is proper. The State argues that *Romano* properly balances the victim's right to be free from intrusion with the defendant's right to a fair trial. It argues that psychological examinations should be used sparingly because of the likelihood of intimidating and harassing a witness and creating a hesitancy to prosecute.

Abbott argues that not requiring the victim to submit to the examination deprives the defendant of the opportunity to have a witness examined, even when he has demonstrated a compelling need, and denies the defendant due process. Abbott contends that the very high threshold burden of demonstrating compelling need sufficiently protects victims from unnecessary or traumatizing invasions of privacy. Finally, Abbott argues that there is little concern with dissuading victims in sexual assault cases to come forward because it is unlikely that the victim of a sex crime considers in advance of trial whether she will report a sex crime because of the risk of a psychological examination at a future date, especially when that victim is a child.[21] We agree with Abbott.

There are two competing concerns with ordering psychological evaluations of child victims—fairness to the defendant by ensuring reliability of the child's testimony and protecting child victims.[22] Although *Romano* recognized that Nevada courts have the authority to order psychological evaluations of child victims, *Romano* eviscerated its own holding by also announcing that the child victim is not required to submit to the evaluation.[23] *Romano* attempted

---

[21]*In re Michael H.*, 602 S.E.2d 729, 734 (S.C. 2004).

[22]*Romano*, 120 Nev. at 627, 97 P.3d at 604 (ROSE, J., dissenting).

[23]*Id.* at 630, 97 P.3d at 605.

to address this by then preventing the State from producing expert testimony. However,

> [t]his may solve the fairness question in most cases, but certainly not in all cases. Instances where a child is under a psychological impediment to telling the truth or has been extensively coached are just two examples of cases where an examination of the alleged child victim would be appropriate, even if the State does not plan to use an expert witness at trial.[24]

Child victims are, and rightly so, compelling, sympathetic witnesses. However, by allowing a child victim to decline to submit to a psychological evaluation when the defendant has proved a compelling need for the examination subjects that defendant to a very sympathetic, adverse witness, without an opportunity to present an adequate depiction of the child's character for truthfulness. The defendant is, in essence, left without a defense.

Most other courts impliedly hold that, once the psychological examination has been ordered, the victim must submit to the examination.[25] However, some courts conclude that compelling a victim to submit to a psychological examination "violates the public policy designed to protect the victim's right to privacy and to prevent further trauma to the victim."[26] Thus, those courts hold that the district court may not compel the victim to appear at the examination.[27]

In addressing the two competing policies, the South Carolina Supreme Court concluded that when the defendant has met the initial burden of demonstrating a compelling need, this compelling need, along with the trial court's proper exercise of discretion, "sufficiently protects victims from unnecessary or traumatizing invasions of their privacy."[28] The South Carolina court concluded that, especially when the victim is a child, a psychological evaluation is fundamentally important to the defendant's defense because "[c]ases involving child victims present special concerns that

---

[24]*Id.* Further, there would be instances where the State would desire to call a psychological expert, "only to be precluded by the child victim refusing." *Id.*

[25]*See e.g.*, *State v. LeBlanc*, 558 So. 2d 507, 509-10 (Fla. Dist. Ct. App. 1990); *In re Michael H.*, 602 S.E.2d at 732.

[26]*In re Michael H.*, 602 S.E.2d at 733 (discussing cases).

[27]*E.g.*, *People v. Williams*, 581 N.E.2d 228, 232 (Ill. App. Ct. 1991) (statutory prohibition); *State v. Little*, 861 P.2d 154, 159 (Mont. 1993).

[28]*In re Michael H.*, 602 S.E.2d at 733. Also, "a victim's rights will not be compromised where *compelling need* is the standard for ordering psychological evaluations of child complainants." *Id.* at 735.

weigh in favor of allowing judicial discretion to order psychological evaluations."[29]

Sex crimes against children are extremely upsetting, and our Legislature placed a very severe punishment to fit the crime. As such, it is vitally important that if this penalty is imposed, it is imposed only on a defendant deserving of the punishment. This can only be assured where the defendant is given a meaningful opportunity to present his defense.[30] Thus, we conclude that *Romano* impermissibly infringes on a defendant's fair trial rights, and we return to *Koerschner* as the appropriate test to determine whether a criminal defendant is entitled to an independent psychological examination of a victim. Accordingly, we apply *Koerschner* to the instant case.

### Whether the State called or benefited from a psychological expert—Chapman v. State[31]

Although the State did not call a designated psychological expert to testify to the victim's credibility, the State called William Ettinger, the LVMPD detective who examined the victim. We conclude that Ettinger testified as an expert witness.[32]

We have previously stated that "a person need not be a licensed psychologist or psychiatrist in order for their testimony to constitute that of an expert."[33] "[W]here a State's expert testifies concerning behavioral patterns and responses associated with victims of child sexual abuse, courts have recognized that this type of testimony puts the child's behavioral and psychological characteristics at issue."[34] However, in *Chapman*, this court stated that "the clinical forensic interviewer who interviewed the victim concerning the incidents of sexual abuse does not qualify as an 'expert'" for

---

[29]*Id.* at 734.

[30]*State v. District Court (Romano)*, 120 Nev. 613, 630-32, 97 P.3d 594, 605-06 (2004) (ROSE, J., dissenting) ("[T]he Legislature has dramatically increased the penalties for child sexual assault and child molestation. With the penalties increasing to extreme levels, this court should at least maintain the existing safeguards in place to evaluate the reliability of a child victim's testimony. With the removal of these safeguards, there is a greater chance that a defendant will be wrongfully convicted, which is even more troubling given the increased consequences of such a conviction." (footnotes omitted)).

[31]117 Nev. 1, 16 P.3d 432 (2001).

[32]Although Abbott has not raised this issue on appeal, we exercise our authority to address plain error on direct appeal sua sponte. *Jezdik v. State*, 121 Nev. 129, 140, 110 P.3d 1058, 1065 (2005).

[33]*Chapman*, 117 Nev. at 5, 16 P.3d at 434.

[34]*Marvelle v. State*, 114 Nev. 921, 927, 966 P.2d 151, 154-55 (1998), *abrogated on other grounds by Koerschner v. State*, 116 Nev. 1111, 13 P.3d 451 (2000), *modified by Romano*, 120 Nev. 613, 97 P.3d 594.

purposes of whether the State relied on an expert.[35] Thus, under a literal reading of *Chapman*, Detective Ettinger is not considered a psychological expert for the purposes of whether Abbott is entitled to an independent psychological examination.

We conclude that *Chapman*'s blanket conclusion that the clinical forensic interviewer is not an "expert" is too inflexible and must be modified. A witness is acting as an expert witness, for the purposes of *Koerschner*, when he does more than merely relate the facts and instead analyzes the facts and/or states whether there was evidence that the victim was coached or biased against the defendant. Therefore, should the State decide to call its forensic investigator, the State should limit the testimony to recitation of the facts of the interview. If the State intends that the investigator will testify beyond the facts of the case and will provide his own experiences and assessments of the interview, the State must notify the district court prior to trial, so as to afford the defendant time to request his own independent psychological evaluation of the victim or otherwise obtain rebuttal testimony.

To illustrate, Detective Ettinger testified that pursuant to his employ in the sexual abuse detail, he received training on how to interview a child witness. His training included attendance at several conferences describing techniques for effective interviewing of a child witness. Detective Ettinger testified about the concepts he is concerned with when interviewing a child witness. He stated,

> You want to make sure you don't ask the child any leading questions.
>
> You want to ask them open-ended questions so they tell you what happened.
>
> You also want to find out what the child's vocabulary is; what do they call certain things. You want to use their words, because if you used your words they don't understand what you're talking to and you're not going to get a truthful answer.
>
> You want to make sure they understand the concept of a truth or a lie, understand spacial [sic] concepts, things like that.

Detective Ettinger then described the interview with the victim, and he detailed the mechanisms he used to ensure that "it was a fair interview." He testified,

---

[35]*Chapman*, 117 Nev. at 5, 16 P.3d at 434 (citing *Marvelle*, 114 Nev. at 930, 966 P.2d at 156).

When we started off the interview I told [the victim] she could correct me, if at any time I made a mistake. She didn't get in trouble for correcting me.

I even test the child when I do that to see if they will.

. . . .

[I] [u]sually misstat[e] their age or what grade they are in.

. . . .

To make sure the victim or the interviewee understands the concept that they actually can correct me without getting in trouble.

When asked if Detective Ettinger discussed the difference between telling the truth and a lie, he testified that he discusses that with the victim. He testified,

I hold up a pencil or a pen, whatever I'm using, and say— ask the interviewee if I call this an elephant would I be telling the truth or a lie?

They say I'm telling a lie.

At that time we make a promise to only tell the truth while we're talking to each other.

Detective Ettinger then testified that he performed the above technique with the victim in this case and that her answers were consistent with what he expected. He then described other techniques that he used to determine whether the child understands the concepts of being touched on top of clothing or underneath clothing, colors, and anatomy.

Finally, when describing his interview with the victim, Detective Ettinger testified,

Q.  In terms of the interviews you do with children, let me clarify—how old was [the victim] during this interview?

A.  She was nine at that time.

. . . .

Q.  Did she give good detail for a person—

A.  Yes.

. . . .

Q.  Now, during your interview do you have any safeguards to try and determine whether a witness has been coached in terms of what to report?

A.  Yes.

Q.  Did you use those safeguards in this case?

A.  Yes.

Q.  *Could you determine whether or not there was any evidence of being coached or led or told what to say to you during the interview?*

A. *I didn't find any, no.*

Q. Did you also discuss a concept of fun things that are done between a witness and the suspect?

A. Yes.

Q. Did you do that in this case?

A. Yes, I did.

Q. What would be your purpose in discussing fun things done with the Defendant?

A. To see if there is a grudge or to validate what the victim is saying. Um, its been my experience that children, if they are having fun with an individual there's no reason for them to make up the allegation that there is one.

I ask them what are some of the fun things they do to show there was a happy[ ] co-existence between the two of them.

. . . .

Q. Do you do that just to make sure there's not a bias or grudge that they pursue?

A. Correct.

(Emphasis added.) *Detective Ettinger then testified that the victim only discussed fun things that she did with Abbott and did not mention anything that was not fun.*

Detective Ettinger's testimony discusses, at great length, the techniques and safeguards Detective Ettinger utilizes to ensure a truthful and accurate accounting by the child victim. He described "behavioral patterns and responses associated with victims of child sexual abuse."[36] Most importantly, through description of the techniques he used and the victim's responses to these techniques, Detective Ettinger's testimony strongly indicated that the victim's allegations were true and that she was a credible witness. Therefore, in so testifying, because Detective Ettinger had personally examined the victim, analyzed the facts, and gave his opinion whether the victim had been coerced or was biased, Detective Ettinger testified as an expert witness for the State.

This is not to say that in every instance of child sexual abuse the investigating officer will be deemed a psychological expert. *Chapman* remains good law when a witness merely recites percipient facts. However, in situations such as this, where the investigating officer has training in interviewing child sexual assault victims, describes techniques used to determine truthfulness, analyzes the facts of the interview, and/or states whether there was evidence that the victim was coached or biased against the defendant, the investigating officer will be deemed a psychological expert for the purposes of *Koerschner*.

---

[36]*Marvelle*, 114 Nev. at 927, 966 P.2d at 154-55.

*Whether there was little or no corroboration evidence*

In the instant case, there was no corroborating evidence beyond the victim's testimony. The sexual act involved was fondling, and as such, there was no physical evidence of the act, and no one other than the victim and Abbott was present at the time of the incident.[37]

*Whether there is a reasonable basis for believing that the victim's mental or emotional state may have affected his or her veracity*

Finally, there was a reasonable basis for believing that the victim's mental or emotional state may have affected her veracity. The victim had previously accused her father, schoolmates, and Abbott of sexual assault and fondling. The victim told a counselor that she made the Colorado allegations against Abbott for attention. Tracy and David both stated that they did not believe the Colorado allegations.

The victim had also engaged in other forms of sexual behavior, including placing items into her vagina, since she was four years old. The victim had watched pornography and had seen pornographic images depicting sexual activities between men and women on the day of the accusation. The victim saw her father showering with his girlfriend, an exotic dancer, and the victim emulated the girlfriend's activities by pole dancing on Tracy's bed. The fact that the victim made prior unsubstantiated allegations, engaged in sexual behavior, and had been exposed to sexual activities demonstrates that there was a reasonable basis to believe that her mental or emotional state may have affected her veracity. When coupled with Detective Ettinger's testimony and the lack of corroborating evidence, we conclude that Abbott demonstrated a compelling need for a psychological examination, and the district court abused its discretion by denying his request. We cannot conclude that this error was harmless,[38] as it is not " " " "clear beyond a reasonable

---

[37]The State argues that there is corroborating evidence because Abbott testified that he went into the victim's room to read to her before bed. The State also argues that the fact that the sexual conduct in question does not result in physical evidence does not mean that Abbott did not sexually abuse the victim. We conclude that the State's arguments are without merit. The mere fact that Abbott testified to similar preceding events as the victim does not corroborate that Abbott committed lewdness with the victim. Regarding the lack of physical evidence, Abbott is not using the lack of physical evidence as proof that he did not molest the victim, but instead as a factor to demonstrate a need for an independent psychological examination.

[38]NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

doubt that a rational jury would have found the defendant guilty absent the error."' ' '"[39]

### Prior false allegations—Miller v. State[40]

Abbott argues that the district court erred by refusing to admit evidence of the victim's prior false allegations and that the district court denied him a *Miller* hearing. Addressing first Abbott's contention that he did not get a *Miller* hearing, Abbott failed to follow the proper procedure discussed below for obtaining a *Miller* hearing with regard to the Colorado allegations. Abbott's counsel was waiting on records from Colorado to file the motion to admit the Colorado allegations. It is unclear whether those records were received prior to trial, but the records were not received prior to the district court order denying the admission of evidence of the Colorado allegations. Consequently, Abbott's counsel never formally, nor properly, moved for admission of the evidence of the Colorado allegations.[41] Although we conclude that Abbott failed to follow the proper procedure to receive a *Miller* hearing, we also conclude that the district court's exclusion of evidence of the Colorado investigation and other prior false allegations was plain error that affected Abbott's substantial rights.[42]

The trial court has sound discretion to admit or exclude evidence of a victim's prior false allegations or prior sexual experiences. NRS 50.090, Nevada's rape shield law, precludes admission of a victim's previous sexual conduct. However, this court has carved out an exception to NRS 50.090, holding that it does not encompass prior false allegations of sexual abuse or sexual assault[43] because "it is important to recognize in a sexual assault case that the complaining witness' credibility is critical and thus an alleged victim's prior fabricated accusations of sexual abuse or sexual assault are highly probative of a complaining witness' credibility concerning current sexual assault charges."[44] As such, " 'defense counsel may cross-examine a complaining witness about previous

---

[39]*Allred v. State*, 120 Nev. 410, 415, 92 P.3d 1246, 1250 (2004) (quoting *Wegner v. State*, 116 Nev. 1149, 1155, 14 P.3d 25, 30 (2000) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999))).

[40]105 Nev. 497, 779 P.2d 87 (1989).

[41]The prior false allegations were addressed because the State moved to introduce the allegations as prior bad acts. During the hearing on the State's motion, Abbott argued that he also intended to move to admit the allegations, but as prior false allegations under *Miller*.

[42]*Moore v. State*, 122 Nev. 27, 37, 126 P.3d 508, 514 (2006).

[43]*Efrain M., a Minor v. State*, 107 Nev. 947, 949, 823 P.2d 264, 265 (1991).

[44]*Miller*, 105 Nev. at 500, 779 P.2d at 89.

fabricated accusations, and if the witness denies making the allegations, counsel may introduce extrinsic evidence to prove that, in the past, fabricated charges were made.' '"[45]

Before introducing evidence of prior false accusations, the defendant must file a notice of intent to cross-examine and present evidence regarding prior false allegations. The district court then conducts a hearing, outside the jury's presence, "to determine the propriety of such questioning and the admissibility of corroborative evidence."[46] At that time, the defendant must prove by a preponderance of the evidence that "(1) the accusations were made; (2) the accusations were false; and (3) the extrinsic evidence is more probative than prejudicial."[47]

In addressing this issue, we were concerned over the rigor of *Miller*'s standards and procedures, and we ordered the parties to provide supplemental briefing discussing whether we should revisit and revise *Miller*. Unfortunately, Abbott's attorney argued that *Miller* should not be revisited because *Miller* "strikes the right balance" and the threshold for admission is not "an exceedingly high threshold." In our opinion, with which Abbott would likely agree, Abbott's attorney should have taken this opportunity to advocate for a lowered evidentiary burden. In contrast, the State did not address *Miller*'s threshold for admission and, instead, argued that *Miller* should be revisited to overrule the portion that permits introduction of extrinsic evidence when the witness denies or does not remember making prior false allegations. After considering the supplemental briefing and hearing oral argument on this issue, we decline to revise *Miller*. We will first address the threshold standard for admission and then address the State's argument regarding extrinsic evidence.

### *Threshold standards for admissibility—the preponderance of the evidence standard*

Two of the reasons courts permit introduction of prior false allegations are because prior false allegations are intertwined with the defense theory that the witness had a motive to fabricate the current charges because she had fabricated charges in the past,[48]

---

[45]*Efrain M.*, 107 Nev. at 949, 823 P.2d at 265 (quoting *Miller*, 105 Nev. at 501, 779 P.2d at 89). *Miller* also carved out an exception in sexual assault cases from NRS 50.085(3), which is Nevada's collateral evidence rule. *Miller*, 105 Nev. at 501, 779 P.2d at 89.

[46]*Miller*, 105 Nev. at 502, 779 P.2d at 90.

[47]*Efrain M.*, 107 Nev. at 950, 823 P.2d at 265.

[48]*See Stamps v. State*, 107 Nev. 372, 377, 812 P.2d 351, 354 (1991) (concluding that defendant's confrontation rights were violated because he was un-

and because prior false allegations are part of affording a defendant the due process right to " 'a fair opportunity to defend against the State's accusations.' "[49] Most courts require a threshold showing that the prior allegations were made and were false.[50] However, courts differ on the appropriate burden for proving falsity.[51]

The required showings range from high to low, or from clear and convincing evidence,[52] to Nevada's preponderance of the evidence standard,[53] to a showing of falsity.[54] No matter the formulation, the concern expressed by every court in announcing its standard is that there is an adequate showing of falsity prior to admitting the allegations. In doing so, courts are attempting to balance the defendant's constitutional rights with desires to keep the victim free from harassment and to maximize judicial economy.[55]

After *Miller*, this court described the preponderance of the evidence standard as a standard that "should lead the trier of fact 'to find that the existence of the contested fact is more probable than its nonexistence.' "[56] And, "[p]roof of falsity must be something more than a bare, unsupported opinion that the complaining witness is lying about certain events. Purported false allegations require some independent factual basis of falsity in order to be admissible in evidence."[57]

---

able to introduce evidence of prior false allegations to corroborate his theory that the victim-witness's mother instigated the entire incident).

[49]*Brown v. State*, 107 Nev. 164, 167, 807 P.2d 1379, 1381 (1991) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).

[50]*Smith v. State*, 377 S.E.2d 158, 160 (Ga. 1989); *State v. West*, 24 P.3d 648, 653-61 (Haw. 2001); *Clinebell v. Com.*, 368 S.E.2d 263, 266 (Va. 1988).

[51]*West*, 24 P.3d at 655; *State v. Quinn*, 490 S.E.2d 34, 40 (W. Va. 1997).

[52]*State v. Gordon*, 770 A.2d 702, 704-05 (N.H. 2001); *State v. Wyrick*, 62 S.W.3d 751, 778 (Tenn. Crim. App. 2001); *see also Hughes v. Raines*, 641 F.2d 790, 792 (9th Cir. 1981) ("convincingly [shown] that the other charge was false"); *Little v. State*, 413 N.E.2d 639, 643 (Ind. Ct. App. 1980) ("demonstrably false").

[53]*Miller v. State*, 105 Nev. 497, 502, 779 P.2d 87, 90 (1989); *Morgan v. State*, 54 P.3d 332, 339 (Alaska Ct. App. 2002); *West*, 24 P.3d at 656; *State v. Long*, 140 S.W.3d 27, 30-32 (Mo. 2004); *State v. Guenther*, 854 A.2d 308, 324 (N.J. 2004).

[54]*People v. Sheperd*, 551 P.2d 210, 212 (Colo. Ct. App. 1976) ("supportable" contention); *Com. v. Bohannon*, 378 N.E.2d 987, 991 (Mass. 1978) ("factual basis" of falsity); *State v. Anderson*, 686 P.2d 193, 200 (Mont. 1984) (showing the witness admitted falsity).

[55]*E.g.*, *Brown v. State*, 107 Nev. 164, 167, 807 P.2d 1379, 1381 (1991).

[56]*Id.* at 166, 807 P.2d at 1381 (quoting Edward W. Cleary, *McCormick on Evidence* § 339 (3d ed. 1984)).

[57]*Id.*

Although there is a substantial concern with protecting defendants' fair trial rights, and it is often difficult to prove that prior accusations are false, we conclude that *Miller*'s middle-ground preponderance of the evidence standard sufficiently balances the defendant's fair trial rights with the victim's right of privacy.

Applying *Miller* here, Abbott demonstrated, by a preponderance of the evidence, that the allegations were made and were false through the evidence generated in connection with the Colorado police investigation. Also, Tracy kept a "diary" regarding the victim's other allegations and there was evidence that both Tracy and David had represented that they did not believe the victim's other allegations. Although this evidence is prejudicial against the victim, we conclude that the probative value of the evidence outweighs the prejudice because evidence of prior false allegations is critical to Abbott's presenting a defense and receiving a fair trial. Thus, we conclude that the district court committed plain error by denying Abbott's request to admit prior false allegations.

### Extrinsic evidence

When the defendant meets his burden, the district court will permit cross-examination, and if the witness denies or fails to recall making the prior false allegations, the defendant may introduce extrinsic evidence of the accusations.[58] The State argues that extrinsic evidence should not be permitted.

Although courts vary in their rationale,[59] the majority of courts permit the defendant to cross-examine a complaining witness regarding prior false allegations.[60] Courts, however, are split regarding whether extrinsic evidence is permitted. Like Nevada, a majority of courts permit extrinsic evidence of prior false allegations.[61] Some courts, however, prohibit extrinsic evidence, gener-

---

[58]*Miller v. State*, 105 Nev. 497, 502, 779 P.2d 87, 90 (1989).

[59]*Guenther*, 854 A.2d at 321.

[60]*Smith v. State*, 377 S.E.2d 158, 160 (Ga. 1989); *Guenther*, 854 A.2d at 320-21.

[61]*E.g.*, *West v. State*, 719 S.W.2d 684, 686-87 (Ark. 1986), *superseded by statute as stated in Ridling v. State*, 72 S.W.3d 466 (Ark. 2002); *Little v. State*, 413 N.E.2d 639, 643-44 (Ind. Ct. App. 1980); *State v. Smith*, 743 So. 2d 199, 202 (La. 1999); *People v. Mikula*, 269 N.W.2d 195, 198-99 (Mich. Ct. App. 1978), *superseded by rule as stated in Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989); *State v. Long*, 140 S.W.3d 27, 30-32 (Mo. 2004); *State v. Gordon*, 770 A.2d 702, 704-05 (N.H. 2001); *Clinebell v. Com.*, 368 S.E.2d 263, 265 (Va. 1988).

ally concluding that it violates traditional rules of evidence and that there is nothing mandating such an exception for sexual assault cases.[62]

The purpose of the evidentiary rule banning extrinsic evidence is to focus the fact-finder on the most important facts and conserve "judicial resources by avoiding mini-trials on collateral issues."[63] However, this policy is only applicable with regard to collateral issues, and the policy is not served when the extrinsic evidence relates to a central issue in the case. An issue is central if it is a " 'crucial issue directly in controversy.' "[64] Further,

> [w]here . . . a witness' credibility is a key factor in determining guilt or acquittal, excluding extrinsic evidence of the witnesses' [sic] prior false allegations deprives the fact-finder of evidence that is highly relevant to a crucial issue directly in controversy; the credibility of the witness. An evidentiary rule rendering non-collateral, highly relevant evidence inadmissible must yield to the defendant's constitutional right to present a full defense.[65]

Although courts vary on the rationale for allowing extrinsic evidence, the underlying purpose is the same—to "strike[ ] the appropriate balance between avoiding misguided focus on collateral issues while allowing the accused to fully defend against the charge."[66] Extrinsic evidence is an important part of cross-examining a witness who has made prior false allegations. After the district court determines that the accusations were made and were false and that the defendant is entitled to admit them, it would nullify any effect of the prior false allegations if the defendant was not permitted to provide evidence demonstrating falsity if the victim-witness denies making or cannot remember making the prior false allegations. To exclude such evidence would strip *Miller* of all purpose. Therefore, we reject the State's request to revise *Miller*.

---

[62]*E.g.*, *State v. Almurshidy*, 732 A.2d 280, 287 n.4 (Me. 1999); *State v. Wyrick*, 62 S.W.3d 751, 780-82 (Tenn. Crim. App. 2001).

[63]*Long*, 140 S.W.3d at 30.

[64]*Id.* (quoting *State v. Williams*, 849 S.W.2d 575, 578 (Mo. Ct. App. 1993)).

[65]*Id.* at 30-31; *see also State v. Anderson*, 686 P.2d 193, 199 (Mont. 1984) (stating that most jurisdictions agree that "evidence of prior false charges may often be probative of the complaining witness' specific reputation for untruthfulness").

[66]*Long*, 140 S.W.3d at 31.

## CONCLUSION

We conclude that the district court abused its discretion by denying Abbott an independent psychological examination of the victim and by denying admission of the prior false allegations. Both errors are of such magnitude as to require reversal of Abbott's conviction. Accordingly, we reverse the district court's decision and remand for a new trial.

MAUPIN, GIBBONS, DOUGLAS, HARDESTY and PARRAGUIRRE, JJ., concur.

BECKER, J., concurring in part and dissenting in part:

I would not retreat from *State v. District Court (Romano)*.[1] I concur with the remainder of the opinion.

---

[1]120 Nev. 613, 97 P.3d 594 (2004).